*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 04a0396p.06

# UNITED STATES COURTS OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————

SEAD PILICA,

*Petitioner,*

*v.*

No. 02-4348

JOHN ASHCROFT,

*Respondent.*

On Appeal from the Board of Immigration Appeals.
No. A72-411-533.

Submitted: August 13, 2004

Decided and Filed: November 15, 2004

Before: MOORE and COLE, Circuit Judges; MARBLEY, District Judge.[*]

—————————

**COUNSEL**

**ON BRIEF:** Robert M. Birach, Detroit, Michigan, for Petitioner. Stephen J. Flynn, Mary Jane Candaux, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

—————————

**OPINION**

—————————

ALGENON L. MARBLEY, District Judge. Petitioner, Sead Pilica, is a native and citizen of Yugoslavia. He seeks reversal of the October 30, 2002, decision of the Board of Immigration Appeals ("BIA" or the "Board") affirming the denial of his asylum application and denying his motion to remand. Petitioner argues (1) that the BIA abused its discretion by denying the motion to remand in a summary decision; (2) that the BIA erred by applying the current standard of review to his appeal rather than the standard in effect when his case commenced; and (3) that the denial of asylum by the Immigration Judge ("IJ") was not supported by substantial evidence. Respondent, John Ashcroft, in addition to contesting Petitioner's arguments, contends that this Court lacks jurisdiction to review the BIA's denial of the motion to remand.

Based on the following analysis, the Court finds jurisdiction over the denial of the motion to remand to be proper. In its exercise of that jurisdiction, the Court **REMANDS** this case to the Board to provide an explanation for that denial. The BIA's decision on Petitioner's asylum and withholding of removal claims is **AFFIRMED**.

—————————

[*]The Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

1

# I. BACKGROUND

Petitioner entered the United States without inspection on August 22, 1991. On February 13, 1998, the Immigration and Naturalization Service served Pilica with a Notice to Appear charging him with removability under § 212(a)(6)(A)(i) of the Immigration and Nationality Act ("INA"), codified at 8 U.S.C. § 1182(a)(6)(A)(i). At a hearing before the IJ, Pilica, through counsel, admitted the factual allegations of the Notice to Appear, conceded removability, and requested a continuance to apply for asylum. Pilica requested the following relief: (1) asylum pursuant to INA § 208(a), 8 U.S.C. § 1158(a); (2) withholding of removal pursuant to INA § 241(b)(3)(A), 8 U.S.C. § 1231(b)(3)(A); (3) withholding of removal under the United Nations Convention Against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment (the "Convention Against Torture") pursuant to 8 C.F.R. § 208.16(c), *et seq.*; and (4) in the alternative, voluntary departure pursuant to INA § 240B, 8 U.S.C. § 1229c. A hearing on the merits of Pilica's claims was held on April 9, 2001.

Petitioner and his brother, Nedin Pilica, were the only two witnesses at the hearing. Documentary evidence presented included Pilica's written asylum applications; a hospital report confirming that Pilica had suffered a head injury; and numerous documents relating to country conditions in Yugoslavia. Petitioner testified that he is an ethnic Albanian who had been politically active with the Albanian Democratic Party in Montenegro, the Yugoslavian republic in which he lived. He testified that he had twice been arrested as a result of his participation in Albanian Democratic Party demonstrations. He was detained for a week in conjunction with each arrest.[1] Pilica testified that during a third demonstration, he was beaten by policemen, resulting in head injuries and hospitalization for a week.[2]

At the conclusion of the hearing, the IJ orally denied Pilica's applications for asylum, withholding of removal, Convention Against Torture relief, and voluntary departure. The IJ found that Pilica lacked credibility and had failed to establish statutory eligibility for relief. The IJ based his adverse credibility finding on inconsistencies between the testimony of Pilica and his brother, internal inconsistencies in Pilica's testimony, inconsistencies between the written asylum applications and Pilica's testimony at the hearing, and Pilica's failure to corroborate his testimony. The IJ ultimately found that Pilica had not established by credible evidence that he had suffered any prior torture or persecution. In the alternative, the IJ found that, even assuming Pilica's credibility, he had not demonstrated past persecution, a well-founded fear of future persecution, or that it was more likely than not that he would be subject to torture if he returned to Montenegro. The IJ based this finding on country condition evidence relating to Montenegro and on the fact that Pilica's political involvement was "sparse," consisting only of having attended a few demonstrations at which he held up a sign, clapped, and yelled.

Pilica filed a timely notice of appeal with the BIA. While his appeal was pending, Pilica filed a motion for remand, requesting that the case be remanded to allow him to seek relief, in the form of adjustment of status, that was not available to him at the time of his original hearing. On October 30, 2002, the Board affirmed without opinion the decision of the IJ. In the same decision, the Board also denied, again without opinion, the motion to remand. Pilica seeks review of the Board's decision.

---

[1] Regarding his two terms in jail, Pilica testified as follows: "In the jail I was not tortured but I was mistreated. I was being sworn at."

[2] Pilica also testified about his year of compulsory military service. He said he did not have "any big problems," though he was "not really very accepted there." At the end of his time in the military, he was detained for four days because he had allegedly stolen a hat. Pilica further testified that after leaving the army, he received a number of summonses instructing him to "go in the reserve." He went into hiding for several months to avoid having to re-enter the military. Pilica does not base his claim for asylum, at least in this Court, on any matter relating to his military service.

## II. ANALYSIS

### A. Motion to Remand

#### 1. *Jurisdiction*

As part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), the following provision was enacted: "Notwithstanding any other provision of law, no court shall have jurisdiction to review–(i) any judgment regarding the granting of relief under section . . . 1255 of this title . . . ." 8 U.S.C. § 1252(a)(2)(B), INA § 242(a)(2)(B). Section 1255, in turn, is entitled, "Adjustment of status of nonimmigrant to that of person admitted for permanent residence," and states that adjustment of status may be granted in the discretion of the Attorney General. 8 U.S.C. § 1255, INA § 245. Based upon the language of § 1252(a)(2)(B), it is clear that this Court lacks jurisdiction over the Attorney General's discretionary determination of whether an alien should be granted adjustment of status. Here, however, Petitioner does not appeal from a discretionary determination denying him an adjustment in status. Rather, he appeals from the BIA's denial of his motion in which he sought a remand in order to permit him to *apply* for an adjustment of status.[3] The question is whether the denial of the motion to remand was a judgment "regarding the granting of relief" under § 1255. 8 U.S.C. § 1252(a)(2)(B).

The Sixth Circuit has not addressed this precise issue; however, two cases from other Circuits are instructive. In *Prado v. Reno*, 198 F.3d 286 (1st Cir. 1999), the First Circuit held that INA § 242(a)(2)(B) did not preclude review of the petitioner's claim that the BIA erred in failing to reopen her case. The petitioner had sought a reopening so that she could request an adjustment of status under INA § 245–the same relief as ultimately was desired by Pilica. *Prado* at 288. While finding plausible the INS's reading of the statute as precluding review of any decision *related to* relief under an enumerated section, the court ultimately found that the language of the statute should be narrowly read so as only to preclude review of a decision that actually granted or denied relief under an enumerated section:

> The decision as to which Prado seeks review is not a BIA judgment on whether to adjust Prado's status, which would be a "judgment regarding the granting of relief under" an enumerated section, but is rather a decision not to reopen under 8 C.F.R. § 3.2. . . .
>
> Why, it might be asked, should review of a decision under INA § 245 not to grant an adjustment of status be precluded, while judicial review of the denial of a motion to reopen to petition for adjustment of status is permitted? As explained below, the window for review is narrow; because of other doctrines of jurisdiction and judicial restraint, not all denials of motions to reopen are reviewable. But as to those denials of motions to reopen that are otherwise reviewable, there are several reasons supporting this distinction in our reading of INA § 242(a)(2)(B). The INS has established procedures governing motions to reopen an alien's case when new material information becomes available. In pre-IIRIRA cases, the denial of a motion to reopen was reviewed for abuse of discretion. The language chosen by Congress in INA § 242(a)(2)(B) does not evidence an intent to eliminate this entirely rational, small safety valve–court review that ensures that the agency at least considers new information, even if its ultimate and unreviewable judgment denies the relief sought. It may also be that Congress wished the agency to live by its rules. Congress may have desired court review to provide a minimal control on administrative arbitrariness such as where a motion to

---

[3] Petitioner's motion to remand is the equivalent of a motion to reopen. 8 C.F.R. § 1003.2(c)(4) (2004).

> reopen is timely filed but the agency denies it on grounds of untimeliness. The space left open for judicial review is quite narrow, but it is not irrational for the window to be open a crack, if not wide open.

*Id.* at 290-91 (citations omitted).

In *Zazueta-Carrillo v. Ashcroft*, 322 F.3d 1166 (9th Cir. 2003), the Ninth Circuit provided less extensive reasoning, but ultimately reached the same result:

> This case does not involve a "judgment regarding the granting" of voluntary departure [addressed in one of the enumerated sections]. It involves a decision regarding the denial of a motion to reopen. . . .
>
> Because we are not asked to review the discretionary denial or granting of voluntary departure, . . . § 1252(a)(2)(B)(i) [does not] prevent[] us from exercising jurisdiction.

*Zazueta-Carrillo* at 1170.

Several courts, in addressing the transitional rules of IIRIRA, have held that, pursuant to those rules, a court lacks jurisdiction only to review an order that addresses the merits of an alien's request for relief under one of the enumerated sections.[4] *E.g., Mickeviciute v. INS*, 327 F.3d 1159 (10th Cir. 2003); *Luis v. INS*, 196 F.3d 36 (1st Cir. 1999); *Stewart v. INS*, 181 F.3d 587 (4th Cir. 1999); *Arrozal v. INS*, 159 F.3d 429 (9th Cir. 1998). The transitional rule has slightly different language than the permanent rule: "[T]here shall be no appeal of any discretionary decision under section 212(c), 212(h), 212(i), 244, or 245 of the Immigration and Nationality Act . . . ." IIRIRA, Pub. L. No. 104-208, § 309(c)(4)(E) (1996). The language of the permanent provision is broader than that of the transitional rule. *See e.g., Prado*, 198 F.3d at 290 (noting the distinction between the permanent rule, which states, "any judgment regarding the granting of relief under," and the transitional rule, which states, "discretionary decisions under"). The question is whether this distinction is determinative of a congressional intent to decrease the appellate relief available under the permanent rule as compared to the transitional rule.

The reasoning of cases like *Stewart* seems equally applicable to cases involving the permanent rules. The court in *Stewart* recognized that the statute could be interpreted either way, but decided it was logical to distinguish between the end result sought and the basis for the actual decision to be reviewed:

> The BIA's decision denying Stewart's motion to reopen could logically be interpreted for the purposes of § 309(c)(4)(E) either as a "decision under" § 245 (because the end result is a denial of Stewart's motion to reopen to apply for adjustment of status pursuant to § 245) or as a "decision under" § 242B(e)(2)(A) (the specific reason for the BIA's denial of Stewart's motion to reopen). . . . [W]e believe that the better interpretation of § 309(c)(4)(E) is that it divests courts of jurisdiction only over BIA decisions that address the merits of an alien's request for relief pursuant to those sections. A reviewing court, therefore, must examine the *basis for* the BIA's decision rather than the *end result* of the BIA's decision . . . .

*Stewart*, 181 F.3d at 594-95.

---

[4]The transitional rules apply to aliens who were placed in deportation or exclusion proceedings prior to April 1, 1997, and whose final exclusion or deportation orders were entered after October 30, 1996. IIRIRA, Pub. L. No. 104-208, § 309 (1996). It is undisputed that Pilica is subject to the permanent provisions not the transitional rules.

The Court is aware of no cases holding that an appeals court does not have jurisdiction to review a motion to reopen when the ultimate relief sought is based on one of the provisions enumerated in § 1252(a)(2)(B)(i). There are, however, some apparent wrinkles in the courts' unanimity. In *Rodriguez v. Ashcroft*, 253 F.3d 797 (5th Cir. 2001), the Fifth Circuit interpreted the transitional rules to preclude it from exercising jurisdiction over a motion to reopen. The court explained as follows:

> It is axiomatic that if we are divested of jurisdiction to review an original determination by the Board that an alien has failed to establish that he would suffer extreme hardship if deported, we must also be divested of jurisdiction to review the Board's denial of a motion to reopen on the ground that the alien has still failed to establish such hardship. To hold otherwise would create a loophole that would thwart the clear intent of Congress that the courts not review the discretionary decisions of the BIA.

*Rodriguez*, 253 F.3d at 800.

*Rodriguez*, however, does not represent a departure from the cases already cited. Indeed, the *Rodriguez* court recognized the correctness of *Stewart* and *Arrozal*; it merely distinguished the facts before it from the facts in those cases. *Id.* The motion to reopen in *Rodriguez* was akin to a motion for reconsideration–the BIA actually considered the sufficiency of the evidence of extreme hardship in denying the motion. *Id.* at 799-800. Applying the *Stewart* test, the court found that the Board, in reaching its decision to deny the motion to reopen, "addressed the 'merits of an alien's request for relief pursuant to' a provision of the INA established as discretionary by § 309(c)(4)(E)." *Id.* at 800 (quoting *Stewart*, 181 F.3d at 595).[5]

The case law supports a decision that a motion to reopen that does not involve the consideration of relief on the merits should not be treated as "regarding" the granting of relief under § 1255. The only cases squarely to have considered the issue, *Prado* and *Zazueta-Carrillo*, have so held, and the cases under the IIRIRA transitional rule provide further support for this conclusion. While the language of the permanent rule is broader than the language of the transitional rule, the Court agrees with *Prado* that the difference in language is not determinative. The Court further agrees with the reasoning in *Prado* regarding the importance of a small safety valve in the form of court review to ensure that the BIA lives by its rules and at least considers new information. There is no indication that Congress intended to eliminate this safeguard. Absent clear language to the contrary, this Court will not assume that Congress meant to do so. Jurisdiction over this claim therefore is proper.

### *2. Denial Without Opinion*

Petitioner contends that the BIA abused its discretion by denying his motion to remand without providing a rational explanation. He asks that this Court remand his case to the Board with instructions to provide an explanation for the denial.

The BIA's denial of a motion to remand is reviewed for abuse of discretion. *Fieran v. INS*, 268 F.3d 340, 344 (6th Cir. 2001) (citing *Ashki v. INS*, 233 F.3d 913, 917 (6th Cir. 2000)). "In determining whether the Board abused its discretion, this Court must decide whether the denial of Petitioner's motion to reopen deportation proceedings was made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as invidious discrimination . . . ." *Balani v. INS*, 669 F.2d 1157, 1161 (6th Cir. 1982); *see Daneshvar v. Ashcroft*, 355 F.3d 615, 626 (6th Cir. 2004); *see also Zhao*

---

[5]The only Sixth Circuit decision relating to this jurisdictional issue is an unreported case in which the Court relied on *Rodriguez* in finding a lack of jurisdiction under the transitional rule to review the denial of a motion to reopen. *Mustafa v. INS*, 88 Fed. App. 86, 2004 WL 291181, at *1-2 (6th Cir. Feb. 12, 2004). At issue, as in *Rodriguez*, was a determination of extreme hardship. *Id. Mustafa* therefore is distinguishable from this case.

*v. DOJ*, 265 F.3d 83, 97 (2d Cir. 2001) (reversing and remanding decision denying motion to reopen where BIA failed to explain decision adequately).

Since the Board failed to provide any explanation whatsoever to accompany its decision on Petitioner's motion to remand, it unquestionably failed to supply a "rational explanation." The Court therefore **REMANDS** this case to the BIA for provision of a rational explanation for its decision on the motion to remand.

## B. Asylum Decision

### 1. Standard Applied by the BIA

Pilica's appeal was filed with the Board on April 20, 2001. Effective September 25, 2002, a regulatory reform expanded the Board's system of streamlining the appeals process and changed the standard of review applied by the Board to findings of fact. Procedural Reforms to Improve Case Management, 67 Fed. Reg. 54,878, 54,878-881 (Aug. 26, 2002). Prior to 1999, all appeals were heard by a three-member panel of the Board. *Id.* at 54,879. In 1999, the Attorney General instituted a streamlining process that allowed a single Board member summarily to affirm an IJ's decision without opinion.[6] *Id.* The 2002 regulations "expand[ed] the single-member process to be the dominant method of adjudication for the large majority of cases before the Board." *Id.*

Prior to the 2002 regulations, the Board conducted a de novo review of the cases appealed to it. *Id.* at 54,888. Pursuant to the new regulations, however, the Board is instructed to review an IJ's findings of fact to determine whether the findings are clearly erroneous; all other questions continue to be reviewed de novo. *Id.* at 54,880-881; 8 C.F.R. § 1003.1(d)(3) (2004).[7] The 2002 regulations were to apply to all cases and motions pending on September 25, 2002, with the exception that the new clearly erroneous standard of review would not be used in appeals filed before that date. 8 C.F.R. § 1003.3(f) (2004). The review of Petitioner's case thus should have been conducted de novo, without reference to the clearly erroneous standard.

Petitioner contends that the BIA erred by applying the new standard of review to his appeal and argues that his case should be remanded to the BIA for de novo review, conducted by a three judge panel in accordance with the scope of review standard that existed prior to September 25, 2002. Respondent maintains that, absent any evidence that the Board ignored the regulatory provision requiring it to apply the old standard of review, this Court, based on the presumption of administrative regularity, must accept that the Board applied the correct standard.

A single member of the Board, pursuant to 8 C.F.R. § 3.1(e)(4) (currently § 1003.1(e)(4)), on October 30, 2002, affirmed without opinion the decision of the IJ in this case. The Board's decision tracks the prescribed language for an affirmance without opinion and, also in accordance with the regulation, does not provide further explanation or reasoning. 8 C.F.R. § 1003.1(e)(4)(ii) (2004).[8] Absent evidence to the

---

[6]As of 2001, over 58% of all new cases were sent to be summarily decided by a single Board member. 67 Fed. Reg. at 54,879.

[7]Effective February 28, 2003, the Part 3 regulations in Title 8 were renumbered. 8 C.F.R. § 3.0 (2004). Thus, for example, 8 C.F.R. § 3.1(d)(3) is now 8 C.F.R. § 1003.1(d)(3), and 8 C.F.R. § 3.3(f) is now 8 C.F.R. § 1003.3(f). For convenience, the Court will use the current citations.

[8]The regulation reads, in part, as follows:

> If the Board member determines that the decision should be affirmed without opinion, the Board shall issue an order that reads as follows: "The Board affirms, without opinion, the result of the decision below. The decision below is, therefore, the final agency

contrary, this Court presumes that the BIA applied the correct standard of review. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971) (administrative decision entitled to "presumption of regularity"), *overruled on other grounds*, *Califano v. Sanders*, 430 U.S. 99 (1977); *Yuk v. Ashcroft*, 355 F.3d 1222, 1232 (10th Cir. 2004) ("In view of the presumption of regularity attaching to administrative procedures, we will not assume, without any evidence, that BIA members do not follow the regulations or do not perform their jobs properly.") (citation omitted); *Abdulai v. Ashcroft*, 239 F.3d 542, 550 (3d Cir. 2001) (because of presumption of regularity, petitioner bears burden of proving that BIA did not review record when it considered appeal); *Makonnen v. INS*, 44 F.3d 1378, 1384 (8th Cir. 1995) (BIA entitled to presumption of regularity); *Kaczmarczyk v. INS*, 933 F.2d 588, 595 (7th Cir. 1991) (BIA "is entitled to a presumption of regularity," and petitioner has burden to prove "BIA gave short shrift" to evidence presented); *see also Albathani v. INS*, 318 F.3d 365, 379 (1st Cir. 2003) (BIA summary affirmance does not "establish that the required review is not taking place"). Because Pilica has presented no evidence that the Board failed to apply the correct standard, the Court declines to reverse the Board's decision on this basis.

## 2. The IJ's Decision

### a. Standard of Review and Burden of Proof

The Attorney General has discretion under the Act to grant asylum to a "refugee." INA § 208(b), 8 U.S.C. § 1158(b). A refugee is defined as a person who is unable or unwilling to return to his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). "Disposition of an application for asylum requires a two-step inquiry: first, whether the petitioner is a 'refugee' within the meaning of the statute, and second, whether the petitioner merits a favorable exercise of discretion by the Attorney General." *Perkovic v. INS*, 33 F.3d 615, 620 (6th Cir. 1994) (citing *INS v. Cardoza-Fonseca*, 480 U.S. 421, 428 n.5 (1987)). The alien has the burden of proof at both stages. *Klawitter v. INS*, 970 F.2d 149, 151 (6th Cir. 1992).

In order to demonstrate that he qualifies as a refugee, an alien must establish either that he has suffered actual past persecution or that he has a well-founded fear of future persecution. *Mikhailevitch v. INS*, 146 F.3d 384, 389 (6th Cir. 1998); 8 C.F.R. § 208.13(b) (2004). This Court has held that "persecution" within the meaning of § 1101(a)(42)(A) "requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty." *Mikhailevitch*, 146 F.3d at 390; *see also In re Kasinga*, 21 I. & N. Dec. 357, 365 (BIA 1996) (defining persecution as the infliction of harm or suffering by the government, or persons a government is unwilling or unable to control, to overcome a characteristic of the victim). An applicant who establishes past persecution is presumed to have a well-founded fear of future persecution. *Mikhailevitch*, 146 F.3d at 389; 8 C.F.R. § 208.13(b)(1). That presumption may be rebutted, however, if the government establishes, by a preponderance of the evidence, that there has been a fundamental change in country conditions such that the applicant no longer has a well-founded fear of persecution. *Mikhailevitch* at 389; 8 C.F.R. § 208.13(b)(1)(i).

An alien may establish a well-founded fear of future persecution by demonstrating: (1) that he has a fear of persecution in his home country on account of race, religion, nationality, membership in a particular social group, or political opinion; (2) that there is a reasonable possibility of suffering such persecution if he were to return to that country; and (3) that he is unable or unwilling to return to that country because of such fear. *Mikhailevitch* at 389; 8 C.F.R. § 208.13(b)(2)(i). A well-founded fear of persecution thus has both a subjective and an objective component: an alien must actually fear that he will

---

determination. See 8 CFR 1003.1(e)(4)." An order affirming without opinion, issued under authority of this provision, *shall not include further explanation or reasoning*.

8 C.F.R. § 1003.1(e)(4)(ii) (emphasis added).

be persecuted upon return to his country, and he must present evidence establishing an "objective situation" under which his fear can be deemed reasonable. *Perkovic*, 33 F.3d at 620-21. "A well-founded fear of persecution does not require the applicant to show that he probably will be persecuted if he is deported; '[o]ne can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place.'" *Id.* at 621 (quoting *Cardoza-Fonseca*, 480 U.S. at 431).

In addition to requesting asylum, Petitioner also has requested withholding of removal pursuant to INA § 241(b)(3). Withholding of removal is mandatory if an alien establishes that his "life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 C.F.R. § 208.16(b) (2004); *Klawitter*, 970 F.2d at 151. An applicant seeking withholding of removal faces a more stringent burden than what is required on a claim for asylum. *Mikhailevitch*, 146 F.3d at 391 (citing *Cardoza-Fonseca*, 480 U.S. at 431-32). In order to be entitled to relief, an alien must establish that there is a clear probability that he will be subject to persecution if forced to return to the country of removal. *INS v. Stevic*, 467 U.S. 407, 413 (1984); *Mikhailevitch*, 146 F.3d at 391.

As his third claim for relief, Petitioner seeks withholding of removal under the Convention Against Torture. In order to obtain such relief, an alien has the burden of proving "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2) (2004).

IIRIRA provides the following guidelines for this Court to use in reviewing the Board's decisions:

> (A) [T]he court of appeals shall decide the petition only on the administrative record on which the order of removal is based,

> (B) the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary,

> (C) a decision that an alien is not eligible for admission to the United States is conclusive unless manifestly contrary to law, and

> (D) the Attorney General's discretionary judgment whether to grant relief under section 208(a) [governing applications for asylum] shall be conclusive unless manifestly contrary to the law and an abuse of discretion.

IIRIRA, Pub. L. No. 104-208, § 306(a)(2)(b)(4) (1996) (codified at 8 U.S.C. § 1252(b)(4)); *see Ali v. Reno*, 237 F.3d 591, 593-98 (6th Cir. 2001) (applying standards of review set forth in IIRIRA).[9]

### b.  Credibility

The IJ found that "respondent is [an] inherently incredible witness and respondent's story was not to be believed by the Court." The IJ then went on to detail various inconsistencies between Pilica's

---

[9]Both Petitioner and Respondent mistakenly urge this Court to utilize the standard of review originating in 8 U.S.C. § 1105a and applied in, *inter alia*, *INS v. Elias-Zacarias*, 502 U.S. 478 (1992). Section 1105a, however, was repealed by IIRIRA. IIRIRA, Pub. L. No. 104-208, § 306(b) (1996). The plethora of cases applying the § 1105a standard after the enactment of IIRIRA involve aliens who fit within IIRIRA's transitional provisions because their exclusion or deportation proceedings began prior to IIRIRA's effective date, April 1, 1997. *See* IIRIRA, Pub. L. No. 104-208, § 309(c)(1) (1996) (stating that the IIRIRA amendments, including the repeal of § 1105a and the new standard of review provisions of § 306(a)(2)(b)(4), would not apply to aliens in exclusion or deportation proceedings as of the IIRIRA effective date, and that such proceedings would be conducted without regard to those amendments); *see also* IIRIRA, Pub. L. No. 104-208, § 306(c)(1) (1996) (stating general rule that IIRIRA amendments shall apply to all final orders of deportation or removal and motions to reopen filed after IIRIRA's enactment date [September 30, 1996]). Because Pilica's removal proceeding began on February 13, 1998, cases such as *Elias-Zacarias* are not valid precedent regarding the standard of review to be applied here.

testimony and his brother's testimony, internal inconsistencies in Pilica's testimony, and inconsistencies between Pilica's testimony and his applications for asylum. The IJ also based his credibility determination on Pilica's failure to corroborate his testimony by calling his father and his mother as witnesses, even though both lived in the area and both had personal knowledge of Pilica's circumstances. The IJ appears to have misremembered certain elements of the testimony, and he drew all possible inferences against Pilica. The IJ's adverse credibility findings, however, "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). Based on the administrative record, a reasonable adjudicator would not be compelled to find Pilica credible.

The IJ found Pilica's brother's testimony to have destroyed Pilica's credibility due to the following inconsistencies: (1) Pilica testified that the family name had been Serbianized, whereas his brother testified that no such change had occurred; (2) Pilica's brother testified that when Pilica was beaten by the police he was injured in the legs, while neither Pilica nor the hospital record indicated that there had been any injury to Pilica's legs; (3) Pilica testified that he was beaten up by the Cetnici, which he defined as civilians who wanted to exclude Albanians, whereas Pilica's brother testified that "Cetnici" was a name for the secret police; (4) Pilica stated that his father was not present to testify because his father had arthritis and was not working and Pilica did not want to ask him to come, whereas Pilica's brother testified that their father was at work and could have come to the hearing; and (5) Pilica's brother testified that Pilica told him that something bad had happened to him in each of the years from 1987 to 1991, whereas Pilica testified that things had simply happened throughout the course of this year group, and that there was not necessarily a specific occurrence in each year.

The transcript before this Court does not contain any testimony that the Pilica name had been Serbianized.[10] The transcript also does not contain any statement by Pilica's brother that Pilica was injured in the legs.[11] Pilica and his brother do appear to have defined "Cetnici" differently, though the inconsistency is not significant. The IJ seems to have accurately recalled the testimony regarding the whereabouts of Pilica's father.[12] The IJ's finding regarding the differing testimony about occurrences in

---

[10]Pilica's counsel asked Petitioner if "Pilica" was an Albanian name, and Pilica responded that it was. Some discussion then took place off the record. Coming back on the record, Pilica stated that his family had had to remove their surname from the entrance to their apartment in recent years.

[11]During cross-examination, Pilica's brother provided the following testimony:

> A. . . . [S]o when he got real, really bad beaten up by the Serb, by the military police and he got hospital because he was so bloody that they hit him all over the face (indiscernible).
> Q. His legs too? And besides getting beat up, did anything else happen to him that he told you about?
> A. Anything else happen to him?
> Q. Right. Did he tell you about any other instances besides the, the three or more times that he was beaten up?
> A. Well he said several times in those years.

[12]The IJ questioned Pilica about the whereabouts of his father in the following exchange:

> Q. Where is your father today?
> A. In America.
> Q. Why isn't he here to testify for you?
> A. He does not feel good. He has arthritis. I did not want to ask him that much to come over here.
> . . . .
> Q. All right. And does he have a job?
> A. Yes, he's employed for, right now, right now he does have time off.

The IJ then had the following exchange with Pilica's brother:

different years likewise seems supported by the record, though the testimony on this subject generally was ambiguous.

As internal inconsistencies in Pilica's testimony, the IJ pointed to the following: (1) Pilica's testimony that during the period between December 1990, when he left the army, and April 1991, when he left the country, he was both in hiding, seeing no one other than his relatives and other Albanians, and working either temporarily or part-time; (2) Pilica's confusion and ambiguous testimony about when he was beaten, how many times he was beaten, and by whom he was beaten; (3) Pilica's failure to provide any logical reason for his reluctance to report for military service since he had not served in combat during his initial year-long service in the army and since he provided no particular reason why he thought he would be forced to kill innocent people if he responded to the summonses; and (4) the fact that Pilica, supposedly an ethnic Albanian, testified in Serbo-Croatian rather than Albanian.

Petitioner provides reasons that are at least somewhat plausible for each of these inconsistencies. For example, Petitioner argues that "[i]t is possible to work temporarily (2 months) part-time (20 hours per week) in a place where he would see only his relatives or other Albanians (he testified he was living on a relative's tobacco farm in an ethnically Albanian area) while hiding out for most of the time (6 months)." At least some of these inconsistencies or ambiguities could support a negative credibility finding, however. In particular, Pilica's failure to provide a clear account of the alleged beatings weighs against him.

As far as inconsistencies between his asylum application and his testimony at the hearing, Pilica states, both in the March 11, 1992, request for asylum prepared by his brother and the February 4, 1999, application for asylum prepared by his attorney, that he has been "tortured, interrogated and jailed" because of his political opinion and his nationality. In his original application, Pilica states, "I was mistreated and tortured by the Yugoslav-Montenegrian 'UDBA' (secret police) beacouse [sic] of my statement above . . . . This happened several times during the year of 1987, 88, 89, 90, 91. I was beating [sic] up by group called 'Cetnici' last year beacouse [sic] I was Albanian."[13] Pilica also states, in both applications, that he was arrested "several times" between 1987 and 1991. At the very least, these statements are revealed as exaggerations when compared to Pilica's testimony at the hearing. At most, they cast, as found by the IJ, grave doubt upon Pilica's overall credibility since, even at its most favorable, Pilica's live testimony did not measure up to the claims made in his asylum requests.[14] *Cf. Octaviano de Leon-Barrios v. INS*, 116 F.3d 391, 393-94 (9th Cir. 1997) (finding that discrepancies between two asylum applications "involved the heart of the asylum claim" and therefore supported a negative credibility finding) (quoting *Ceballos-Castillo v. INS*, 904 F.2d 519, 520 (9th Cir. 1990)).

The IJ also did not err in using Pilica's failure to provide corroborating evidence as further support for the negative credibility finding. The IJ noted that (1) Pilica called neither his father nor his mother as corroborating witnesses, even though they both lived in the area and both appeared to have firsthand knowledge of relevant events, as opposed to Pilica's brother, whose only knowledge was based on

---

Q. Now where is your father today?
A. My father is at work.
Q. Where does he work?
A. He works at (indiscernible) restaurant.
Q. He's here because he had to work. Is that right?
A. He is not here because I don't know. He's supposed to be here. If I knew I would bring him over here.

[13] This statement is modified somewhat in Pilica's subsequent application: "I was mistreated and tortured by the Yugoslav-Montenegrian 'UDBA' (Secret Police) because of my statements above. This happened several times during the years of 1987 to 1991. I was beaten up by a group called 'Cetnici' in 1991 because I am an Albanian."

[14] Pilica did not testify to anything that could even remotely be considered "torture." He was arrested only twice, not "several times," and was "mistreated" by the police no more than three times.

conversations with Pilica and his parents; (2) Pilica did not provide any proof that he had been a member of the Albanian Democratic Party, even though his testimony suggested that he could have provided such proof; and (3) Pilica did not offer to speak Albanian or otherwise provide any proof that he was, in fact, ethnically Albanian. The IJ further noted that no reasonable explanation for these failures was provided.[15]

An applicant for asylum is not required to produce corroborating evidence of persecution: "the alien's own testimony can be sufficient to support an application for asylum, 'where the testimony is believable, consistent, and sufficiently detailed to provide a plausible and coherent account of the basis for his fear.'" *Perkovic v. INS*, 33 F.3d 615, 621 (6th Cir. 1994) (quoting *In re Mogharrabi*, 19 I. & N. Dec. 439, 445 (BIA 1987)); *see also* 8 C.F.R. § 208.13(a) (2004) ("The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration."). Because Pilica's testimony plausibly could be viewed as incredible, and certainly could be viewed as inconsistent or incoherent, a fact finder reasonably could find that Pilica's testimony, absent corroboration, was insufficient to meet his burden of proof. The Board's decision therefore is **AFFIRMED**.

### c. Statutory Eligibility

The IJ's decision may be affirmed on the alternative basis that Petitioner, even assuming the credibility of his testimony, did not establish his statutory eligibility for relief. Petitioner did not meet his burden of proving either that he suffered actual past persecution or that he has a well-founded fear of future persecution. Petitioner bases his claim for asylum on three occurrences. Following each of two demonstrations, he was arrested and detained for a week. While Pilica stated that he was "mistreated" while in jail, the only example of mistreatment he provided was being "sworn at." At a third demonstration, Pilica was beaten by policemen, resulting in head injuries and a week-long hospitalization. Pilica has not demonstrated that these isolated occurrences amounted to "persecution." *See Mikhailevitch v. INS*, 146 F.3d 384, 390 (6th Cir. 1998) (stating that persecution "requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty").

Further, Petitioner has not established a well-founded fear of future persecution. The IJ correctly pointed out that Petitioner's political involvement, consisting merely of attending five demonstrations at which he held up signs, yelled, and applauded, was "sparse." Petitioner has not established that, based on this involvement, there is a "reasonable possibility" that he would be targeted for persecution upon his return. *Mikhailevitch v. INS*, 146 F.3d 384, 389 (6th Cir. 1998) (stating that well-founded fear of persecution must be both subjectively and objectively reasonable). There is no indication that he is on some governmental blacklist; indeed, all of the occurrences that arguably constitute past persecution resulted directly from Pilica's attendance at a demonstration rather than from the government having sought him out. *See Perkovic*, 33 F.3d at 621 (stating that the persecutor must be aware the alien possesses the relevant belief or characteristic, must have the capability of punishing the alien, and must have the inclination to punish the alien). The IJ also found that country conditions in Montenegro have improved substantially since Petitioner left. While there is still societal discrimination against ethnic Albanians, the situation in Montenegro is better than in other parts of Yugoslavia, and progress has been made in recent years in increasing Albanians' political representation.

Since Petitioner has not established entitlement to asylum, he clearly has not made the stronger showing necessary for withholding of removal pursuant to INA § 241(b)(3). *See* 8 C.F.R. § 208.16(b) (2004) (stating, for withholding of removal, alien must establish that his "life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion"). He also has not demonstrated his eligibility for Convention

---

[15]Again, however, even if Petitioner provided plausible justifications for these failures, as he attempted to do both at the hearing and in his Brief, the IJ would not be compelled to accept those explanations.

Against Torture relief.  Accordingly, the Board's decision on the substantive relief sought by Petitioner is **AFFIRMED**.

## III.  CONCLUSION

For the foregoing reasons, this Court **AFFIRMS** the Board's decision regarding Petitioner's application for asylum and withholding of removal.  This case is **REMANDED** to the BIA, however, for the provision of a rational explanation for the denial of Petitioner's Motion to Remand.