NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0352n.06

No. 25-3014

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Jul 17, 2025
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| MARIA TORRES DE LOPEZ, et al., | ) | |
| Petitioners, | ) ) | ON PETITION FOR REVIEW |
| v. | ) ) | FROM THE UNITED STATES BOARD OF IMMIGRATION |
| PAMELA BONDI, Attorney General, | ) ) | APPEALS |
| Respondent. | ) ) | OPINION |

Before: BATCHELDER, CLAY, and BLOOMEKATZ, Circuit Judges.

**CLAY, Circuit Judge.** Petitioner Maria Emerita Torres de Lopez ("Lopez"), and her three children, Xiomara Yasmin Lopez Torres, Joselyn Daniela Lopez Torres, and Angel Edenilson Lopez Torres (collectively, "Petitioners") are citizens of El Salvador currently residing in the United States. Petitioners filed an application for asylum under the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1158, and for withholding of removal under both the INA, 8 U.S.C. § 1231(b)(3), and the Convention Against Torture ("CAT"), 18 U.S.C. § 2340 *et seq*. The immigration court denied their application and the Board of Immigration Appeals ("BIA") affirmed. Petitioners now petition for review of the agency's determination.

For the reasons that follow, we **DENY** the petition.

## I. BACKGROUND

Petitioners are citizens of El Salvador who entered the United States in August 2016. The Department of Homeland Security commenced removal proceedings against Petitioners under 8 U.S.C. § 1182(a)(7)(A)(i)(I) by charging Petitioners as subject to removal for failure to possess

a valid unexpired immigrant visa at the time of admission. The removal hearing occurred over the course of two days, in which the immigration court heard from three witnesses: Lopez; Lopez's husband, Domingo Lopez Alvarado ("Alvarado"); and Petitioners' neighbor in El Salvador, Patricia Sartruy Alvarado Rivas ("Rivas").

Alvarado testified first. He explained that he married Lopez in 2012, and the couple had their three children while living in El Salvador. Alvarado is a former police officer and, according to his testimony, decided to resign from the police force and flee El Salvador after encountering troubles with the MS-13 gang. He went on to specify three incidents involving himself and the gang. First, while Alvarado was working in a prison, one of the inmates demanded that Alvarado provide him with drugs, which Alvarado refused. The inmate, who was an MS-13 leader imprisoned for killing two officers, responded by telling Alvarado that "he had already killed two [police officers] and it was not going to be that much of a big deal to kill one more." Admin. R., ECF No. 11-2, 130. The second incident occurred three months later, when Alvarado went to the local police station and found three MS-13 members present. The gang members told Alvarado that they had "the greenlight . . . to kill you." *Id.* at 131. Alvarado then asked for a transfer after this threat, and his supervisors agreed to transfer him to another station where Alvarado worked for two years. The third incident occurred in September 2014, in which Alvarado was involved in a police shootout with members of MS-13 that caused the death of a gang member. Two days after the shooting, a woman who was related to one of the MS-13 members told Alvarado that gang members were looking for police officers involved in the shooting and had identified Alvarado.

One month after the third incident, Alvarado left El Salvador. He did not, however, immediately bring his family with him, as Lopez and their three children remained in El Salvador for another one year and nine months before fleeing. Alvarado also testified that two of his cousins

had been killed by MS-13 for failure to pay extortion and failure to collaborate with the gang. Furthermore, Alvarado explained that after he left the country, MS-13 had killed officers working at Alvarado's old station. Now Alvarado fears returning to El Salvador because he believes MS-13 will kill him. He also does not believe his former employer can protect him because of the limited resources at the police's disposal, and thus fears that his family is at risk.

Lopez then testified. She emphasized that she feared returning to El Salvador because of gang violence, especially considering that she had heard that there were gang-related kidnappings and extortions in the country. Lopez further explained that she was worried because (1) Alvarado was a police officer, (2) Alvarado had received multiple threats while working for the police, and (3) her children had been harassed. Lopez also stated that she believes that MS-13 would target her and her children because of her husband's police history, and that the police would not be able to protect their family if they returned to El Salvador.

Rivas was the last to testify. She was Lopez's neighbor in El Salvador and left the country in 2019. According to Rivas, MS-13 began to use Lopez's house as a recreation area after Lopez left. Rivas further testified that Alvarado was the only police officer in the neighborhood, and that she heard some individuals discussing wanting to make a family member of a police officer disappear.

On October 29, 2019, the immigration court denied Petitioners' applications for relief and protection from removal. The court first determined that Lopez, Alvarado, and Rivas were all credible. The court then evaluated Lopez's application for asylum under INA § 208. Lopez specifically alleged that she suffered past harm or mistreatment due to her membership in a particular social group ("PSG") and political opinion. Lopez defined the PSG as "immediate family members of a former active duty police officer" and the political opinion as "imputed

political opinion of her husband's former employers." *Id.* at 50. The immigration court ultimately denied the asylum application, finding that Lopez had failed to establish "past persecution or a well-founded fear of future persecution." *Id.* Because the court found that Lopez had failed to meet the lower burden of proof for asylum, it found that Lopez necessarily could not meet the higher burden of proof for withholding of removal under INA § 241. Finally, the court found that Lopez was not eligible for withholding of removal under CAT. This was because Lopez "ha[d] failed to demonstrate that it is more likely than not that she will be tortured by the government of El Salvador or with its acquiescence if removed to El Salvador." *Id.* at 52.

Petitioners appealed to the BIA. Petitioners argued not only that the immigration court's conclusions were flawed, but also that their notices to appear were defective and that jurisdiction had therefore not vested with the immigration court. The BIA rejected these arguments and affirmed the immigration court's decision. Petitioners now petition for review.

## II.  DISCUSSION

### A.  Standard of Review

"Where the BIA reviews the immigration judge's decision and issues a separate opinion, rather than summarily affirming the immigration judge's decision," as is the situation in this case, "we review the BIA's decision as the final agency determination." *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009) (citation omitted), *abrogated on other grounds by Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024). "However, to the extent the BIA adopted the immigration judge's reasoning," as is also the situation in this case, "this court also reviews the immigration judge's decision."[1] *Sanchez-Robles v. Lynch*, 808 F.3d 688, 692 (6th Cir. 2015) (citation omitted). The

---

[1] The BIA adopted the immigration court's reasoning. We therefore focus our analysis on the immigration court's reasoning.

Court reviews legal questions de novo. *See id.* "The agency's findings of fact are reviewed for substantial evidence," *Marikasi v. Lynch*, 840 F.3d 281, 286 (6th Cir. 2016) (citation omitted), meaning that those findings "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary," *Slyusar v. Holder*, 740 F.3d 1068, 1072 (6th Cir. 2014) (citation omitted).

**B. Analysis**

**1. Asylum and Withholding of Removal Under the INA**

Petitioner seeks relief under the INA, which mandates withholding of removal if an alien shows that his "life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). An applicant for withholding of removal "must demonstrate that there is a clear probability that he will be subject to persecution if forced to return to the country of removal." *Khalili*, 557 F.3d at 436 (citation and quotation marks omitted). The INA only permits the Attorney General "to grant asylum to applicants who meet the definition of a 'refugee.'" *Umaña-Ramos v. Holder*, 724 F.3d 667, 670 (6th Cir. 2013) (quoting 8 U.S.C. § 1158(b)). To show that an alien qualifies as a refugee, he must show that he (1) "has suffered actual past persecution"; or (2) "has a well-founded fear of future persecution." *Pilica v. Ashcroft*, 388 F.3d 941, 950 (6th Cir. 2004). "Persecution is the infliction of harm or suffering by the government, or persons the government is unwilling or unable to control, to overcome a characteristic of the victim." *Sebastian-Sebastian v. Garland*, 87 F.4th 838, 847 (6th Cir. 2023) (citation and quotation marks omitted). This "requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of

liberty." *Pilica*, 388 F.3d at 950 (citation omitted). An alien can also demonstrate fear of future persecution by showing:

> (1) that he has a fear of persecution in his home country on account of race, religion, nationality, membership in a particular social group, or political opinion; (2) that there is a reasonable possibility of suffering such persecution if he were to return to that country; and (3) that he is unable or unwilling to return to that country because of such fear.

*Id.* A petitioner alleging persecution based on a protected ground must "connect these . . . concepts" by showing that membership in the protected group is "'one central reason' for the persecution." *Cruz-Guzman v. Barr*, 920 F.3d 1033, 1037 (6th Cir. 2019) (quoting 8 U.S.C. § 1158(b)(1)(B)(i)).

The immigration court's asylum and withholding of removal determinations were without error. This is because the court correctly concluded that Petitioners have failed to establish persecution. For example, Petitioners contend that they had suffered actual past persecution. As the immigration court correctly noted, however, much of the testimony presented at the hearing concerned harassment the family faced while in El Salvador. And this Court has made clear that mere harassment is insufficient for asylum. *Pilica*, 388 F.3d at 950. Additionally, the harassment that Petitioners suffered cannot be seen as particularly dangerous. Lopez never testified that she received threats specific to her or her children, and Alvarado's testimony only focused on threats to himself and did not identify a single threat against Petitioners. Furthermore, at no point did any witness suggest that Petitioners suffered "any physical punishment, infliction of harm, or significant deprivation of liberty." *Id.* (citation omitted); *see also Mikhailevitch v. I.N.S.*, 146 F.3d 384, 390 (6th Cir. 1998) (explaining that "'persecution' within the meaning of 8 U.S.C. § 1101(a)(42)(A) requires more than a few isolated incidents of verbal harassment or intimidation,

unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty").

Petitioners' contention that they have a well-founded fear of future persecution is also without merit.[2] This is because Petitioners cannot establish the second *Pilica* element: that there is a reasonable possibility of suffering persecution if they were to return to El Salvador. 388 F.3d at 950. Much of the evidence presented in the removal hearing focused on the threats and potential threats faced by Alvarado. Yet very little evidence was presented that directly demonstrated the risk of future harm to *Petitioners*. For example, Alvarado is no longer a member of the local police, and Petitioners presented no evidence that the family of a *retired* police officer would be subject to persecution. There is also no evidence that Petitioners were in any way harmed or threatened because of political opinions attributed to them. It is certainly true that Lopez broadly asserted in her testimony that she was concerned about the levels of crime in El Salvador. But this Court has clarified that generalized fears of crime in a particular country are not relevant to determining future persecution based specifically on a protected ground. *See Koliada v. I.N.S.*, 259 F.3d 482, 488 (6th Cir. 2001) (per curiam) ("Their fear of crime in the Ukraine and Koliada's fears of economic and environmental problems are legitimate but are not relevant to his fear of future political persecution."). Finally, it must be emphasized that Lopez testified that neither she nor Alvarado's parents had been harmed or threatened since Alvarado left the police force. Those family members undoubtedly fall under the same PSG as petitioners, and as this Court has held: "When the petitioner's family members are also members of his or her protected group, the reasonableness of the petitioner's claim of future persecution is undermined when the petitioner's

---

[2] Petitioners argue that the immigration court and the BIA failed to fully address the issue of fear of future persecution. Yet a review of the immigration court's opinion reveals that the court did in fact apply a full and careful analysis of this issue.

family members remain in the country of removal unharmed." *Amezola-Garcia v. Lynch*, 846 F.3d 135, 142 (6th Cir. 2016).

Petitioners have also failed to connect their alleged persecution to their stated protected groups. Petitioners allege membership in two protected groups, and they are required to show that membership in those groups is "'one central reason' for the persecution." *Cruz-Guzman*, 920 F.3d at 1037 (quoting 8 U.S.C. § 1158(b)(1)(B)(i)). Petitioners' first alleged protected group is membership in the PSG of immediate family members of a former active-duty police officer. Yet as explained above, Petitioners presented no evidence that they were directly threatened or physically harmed because of their affiliation with Alvarado's former profession. The evidence that Petitioners' parents have not faced persecution also indicates that this PSG is unconnected to persecution. Petitioners' second ground of protected membership provides even less of a connection to persecution. That alleged membership is the imputed political opinion of Alvarado's former employers. But there is insufficient information in the record to suggest that MS-13 members did in fact impute the political opinions of the police onto Petitioners. Nor does Petitioners' brief before this Court provide any such evidence.

Petitioners argue that the BIA and the immigration court erred by failing to address whether Salvadoran authorities were unable or unwilling to protect Petitioners. Yet an unwilling and unable finding does not in-and-of-itself establish a petitioner's status as a refugee eligible for asylum. Instead, a petitioner must prove the unable or unwilling requirement alongside the additional requirements necessary for an asylum finding. *See Ortiz v. Garland*, 6 F.4th 685, 688 (6th Cir. 2021). Since Petitioners have failed to meet the other requirements for asylum, those failures are dispositive of this case, and the agency did not need to address the unable or unwilling finding. *See Ortiz-Cervantes v. Holder*, 596 F. App'x 429, 433 (6th Cir. 2015) (holding that agencies are

not required to make findings on non-dispositive issues (citing *INS v. Bagamasbad*, 429 U.S. 24, 25 (1976) (per curiam)).

Petitioners also argue that the agency erred by not considering an additional PSG. They assert that in their argument before the immigration court, Petitioners implied the existence of a second PSG: immediate family members of Alvarado.[3] True, Petitioners concede, they did not explicitly identify this PSG before the immigration court. However, Petitioners argue that this PSG "was implied and should have warranted an analysis from the [immigration court] and the BIA." Pet. Br., ECF No. 17, 28. But it is not the job of the immigration court to simply guess at what possible PSGs might exist based on a petitioner's application. And as we have noted, "an applicant for asylum or withholding of removal must clearly indicate on the record before the Immigration Judge the exact delineation of any particular social group(s) to which she claims to belong." *Mateo-Esteban v. Garland*, 125 F.4th 762, 767 (6th Cir. 2025) (citation and quotation marks omitted).

In summary, Petitioners have failed to show actual past persecution or a well-founded fear of future prosecution. They have also failed to demonstrate a connection between their persecution and their alleged protected groups. Accordingly, the agency did not err in determining that Petitioners are ineligible for asylum or withholding of removal under the INA.

## 2. Withholding of Removal Under CAT

"To obtain relief under CAT, the applicant bears the burden of establishing 'it is more likely than not that he or she would be tortured if removed to the proposed country of removal.'" *Liti v. Gonzales*, 411 F.3d 631, 641 (6th Cir. 2005) (quoting 8 C.F.R. § 1208.16(c)(2)). The torture

---

[3] Recall that Petitioners' original, sole PSG was immediate family members of former active-duty police officers.

must be "inflicted by, or at the instigation of, or with the consent or acquiescence of, a public official acting in an official capacity or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1). "The regulations implementing the CAT define the phrase 'acquiescence of a public official' to require 'that the public official, prior to the activity constituting torture, ha[s] [the] awareness of such activity and thereafter breach[es] his or her legal responsibility to intervene to prevent such activity.'" *Zaldana Menijar v. Lynch*, 812 F.3d 491, 501 (6th Cir. 2015) (alterations in original) (quoting 8 C.F.R. § 208.18(a)(7)). This Circuit has defined "acquiescence" to "include willful blindness." *Id.*

Petitioners cannot prevail under CAT. This is because there is virtually no evidence in the record to suggest that El Salvador is instigating or consenting to torturing Petitioners. At most, Petitioners present broad-based evidence that there is widespread gang violence in El Salvador that the country struggles to contain. Yet as this Court has routinely found, evidence of generalized crime and violence in a foreign country is not enough to establish acquiescence in torture. *See, e.g.*, *Yousif v. Garland*, 53 F.4th 928, 934 (6th Cir. 2022); *Ixcoy v. Holder*, 416 F. App'x 522, 529 (6th Cir. 2011).

Petitioners also contend that the agency failed to address Petitioners' generalized evidence regarding El Salvador's conditions, and such a failure constitutes reversible error. Yet in the same breath, Petitioners also go on to *directly quote* the immigration court's analysis of this evidence. Petitioners highlight that the immigration court specifically explained that while there is danger from gangs in El Salvador, "the Salvadoran government is actively combatting criminal organizations." Pet. Br., ECF No. 17, 33 (quoting Admin. R., ECF No. 11-2, 52). Therefore, Petitioners' own brief suggests that the immigration court did not ignore generalized evidence of

El Salvador's conditions, thus demonstrating not only the irreconcilability of Petitioners' argument, but also the untenability of that argument.

In summary, Petitioners have failed to demonstrate that the government of El Salvador instigated, consented to, or acquiesced in Petitioners' alleged torture. The immigration court did not therefore err in finding that CAT is inapplicable to Petitioners.

### 3. Jurisdictional Argument

Petitioners argue that their notice to appear before the immigration court was defective, thus depriving the immigration court of jurisdiction. Petitioners do not explain in their brief in what ways the notice to appear was defective. However, the BIA's discussion of this issue suggests that the notice did not specify the time and place of Petitioners' removal hearing. This Court has explicitly found that "our court and the other circuit courts widely rejected arguments . . . that a defective notice to appear deprived the executive branch of subject-matter jurisdiction over immigration proceedings." *Tomas-Morales v. Garland*, No. 21-3227, 2022 WL 154343, at *3 (6th Cir. Jan. 18, 2022) (collecting cases). Among the cases that have held this is *Ramos Rafael v. Garland*, in which we held: "For jurisdictional purposes, it is not necessary that the Notice to Appear contain all the required information or that all the information be included in a single document." 15 F.4th 797, 801 (6th Cir. 2021). Petitioners argue that this precedent is bad law in light of the Supreme Court's holding in *Niz-Chavez v. Garland*, 593 U.S. 155 (2021). But as this Court explained in *Tomas-Morales*, there is little reason to find that *Niz-Chavez* upends this rule. 2022 WL 154343, at *3. Furthermore, *Ramos Rafael* is a published case that was decided after *Niz-Chavez*, and expressly held that *Niz-Chavez* does not require that "Notice[s] to Appear contain all the required information." *See* 15 F.4th at 801. We are therefore bound to follow *Ramos Rafael* and find that the defective notice to appear did not deprive the immigration court of jurisdiction.

*See United States v. Ferguson*, 868 F.3d 514, 515 (6th Cir. 2017) ("One panel of this court may not overrule the decision of another panel; only the en banc court or the United States Supreme Court may overrule the prior panel.").

### III. CONCLUSION

For the reasons set forth above, this Court **DENIES** the petition.