**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 05a0409n.06
Filed: May 17, 2005

**No. 04-3054**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**


NUSH KACAJ, GRETA KACAJ, )
XHULIANO KACAJ, and ROZINA KACAJ, )
)
    Petitioners, ) ON PETITION FOR REVIEW FROM AN
) ORDER OF THE BOARD OF
v. ) IMMIGRATION APPEALS
)
ALBERTO GONZALES, Attorney General, )
)
    Respondent. )


Before: MOORE and SUTTON, Circuit Judges; CARMAN, Judge.[*]


SUTTON, Circuit Judge. Rozina and Nush Kacaj, with their two minor children, challenge

a final order of the Board of Immigration Appeals (BIA) denying their requests for asylum,

withholding of removal and protection under the Convention Against Torture. Because the record

does not contain evidence compelling a finding of past persecution (or torture) or a well-founded

fear of future persecution (or torture), we deny the petition.


I.


---

[*] The Honorable Gregory W. Carman, Judge for the United States Court of International
Trade, sitting by designation.

No. 04-3054
*Kacaj v. Gonzales*

On November 8, 2000, Rozina Kacaj, a citizen of Albania, and her two children entered the United States at Boston, Massachusetts, without valid entry documents. She was followed several months later, on January 9, 2001, by her husband, Nush Kacaj, who also entered the United States without valid documentation.

After they were charged with being removable under § 237(a)(1)(A) of the Immigration and Nationality Act (INA), the Kacajs submitted an application for asylum and a request for withholding of removal under the INA and the Convention Against Torture. They alleged then (and reiterate now on appeal) that Nush Kacaj was, prior to fleeing Albania, a member of the Albanian Democratic Party. They also alleged that Nush Kacaj's brother (who died of cancer in 1998) was a member of the Albanian Parliament as a representative of the Democratic Party from March of 1991 until May of 1996. Nush Kacaj served as his brother's bodyguard and held various Democratic Party positions at the village level. Other members of Kacaj's family, several of whom still reside in Albania, were also active in politics.

After the ouster of the Democratic Party in national elections in 1997, Albanian authorities arrested Kacaj three times between 1999 and 2000. On the first occasion (on September 12, 1999), Kacaj was giving a speech in the Albanian city of Koplik, in which he criticized the Socialist government for its inaction after the assassination of the Democratic Party's leader, Azem Hajdari. Following the speech, the police seized Kacaj, held him for two days and questioned him about his political activities. On the second occasion (on October 5, 2000), Kacaj was seized by the police following a political demonstration, handcuffed and left face-down in the back of a van for three

hours. And on the final occasion (on November 15, 2000), Kacaj was taken into custody by Albanian police while en route to a demonstration in Tirana, the capital of Albania. He was held for two days, beaten with rubber truncheons and hit and kicked by officers, but he did not seek (or apparently need) medical treatment after his release.

Kacaj's three arrests were not the only incidents of mistreatment he allegedly experienced at the hands of Albanian authorities or the Socialist opponents of the Democratic Party. During the 1997 election campaign, Socialist Party associates "attacked" Kacaj as he campaigned on behalf of the Democratic Party, for which he received stitches on his right arm. JA 15, 41. On September 14, 1998, Kacaj participated in demonstrations in Tirana to mark the funeral of Hajdari (the Democratic Party's assassinated leader). The demonstrations turned violent; government buildings were set ablaze; the police intervened, using force to disperse the crowd; and, in the resulting melee, Kacaj was struck and wounded in the leg, either by a bullet or a piece of shrapnel. Kacaj next alleged that, en route to a November 2000 demonstration in Tirana, he was stopped by the police, who tore up his passport and refused to allow him to proceed. (He later obtained a new passport by bribing the police.) Lastly, on December 10, 2000—a month after Rozina Kacaj's arrival in the United States and a month before Nush Kacaj's arrival—the Kacajs' apartment was firebombed. Kacaj contacted the police to inform them, but neither he nor the police ever identified the perpetrators.

In support of his application, Kacaj also offered an affidavit on his behalf by William Ryerson, the former ambassador to Albania. (Ryerson was the United States' ambassador to Albania from April of 1991 until October of 1994.) The affidavit indicated that, while Ambassador Ryerson

knew Nush Kacaj's brother "reasonably well" and confirmed that he had been a member of Parliament representing the Albanian Democratic Party, he "[did] not know Mr. Nush Kacaj well." JA 233. The affidavit also stated that Ambassador Ryerson believed Nush Kacaj, "as a northerner and the brother of a staunch and outspoken public opponent of the ruling Socialist (communist) Party," would be "the target of great suspicion and, more likely, retaliatory action." JA 236.

In an oral ruling, the IJ found that the Kacajs' version of events was credible. But it nevertheless denied relief because the Albanian authorities' mistreatment of Nush Kacaj did "not rise to the level of past persecution" or "establish[] a well-founded fear of persecution." JA 20, 45–46. In reaching this conclusion, the IJ did not "assign significant weight" to Ambassador Ryerson's declaration, in part because of his unavailability for cross-examination. JA 47. Because the Kacajs could not identify the people who firebombed their home, the IJ attributed this episode to Albanian "unrest" and "criminal activity" and was "unable to say that [the] incident was on account of [Nush Kacaj's] political opinion or his political activity." JA 46. The IJ reached the same conclusion with respect to the shrapnel/bullet injury suffered during the September 1998 Tirana demonstrations. The IJ therefore ordered the removal of the Kacajs to Albania, a decision that the Board of Immigration Appeals summarily affirmed on December 29, 2003.

II.

When the BIA applies its summary affirmance procedure, as it did here, we review the IJ's decision. *See Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004). Our review of the IJ's decision is

limited, for the determination whether the petitioner was persecuted or has a well-founded fear of future persecution must be upheld "unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see Yu*, 364 F.3d at 702 ("[Section] 1252(b)(4)(B) basically codifies the Supreme Court's substantial evidence standard."); *see also INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992); *Gjokic v. Ashcroft*, Nos. 02-3915, 02-3917, 2004 U.S. App. LEXIS 13719, at *10–11 (6th Cir. June 29, 2004).

To be eligible for asylum, an applicant must be "unable or unwilling to return to . . . [his or her] country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). Persecution, we have said, entails "punishment or the infliction of suffering or harm," not mere "harassment or discrimination without more." *Ali v. Ashcroft*, 366 F.3d 407, 410 (6th Cir. 2004) ("Persecution is an extreme concept that does not include every sort of treatment our society regards as offensive."); *Mikhailevitch v. INS*, 146 F.3d 384, 390 (6th Cir. 1998) (persecution "requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty"); *Hengan v. INS*, 79 F.3d 60, 62 (7th Cir. 1996) ("Persecution differs considerably in degree and effect; the Immigration and Naturalization Service is entitled to restrict asylum to those who have suffered the most, or are at greatest risk in the future. [The applicant] has been through unpleasant experiences, but when she left Romania she was employed and uninjured.").

While the line between persecution and mere harassment is frequently difficult to perceive, our cases provide some guidance in distinguishing between the two. *Compare Ouda v. INS*, 324 F.3d 445, 454 (6th Cir. 2003) (finding persecution where roving armed gangs held the applicant's father at gunpoint, tortured her brother and barred the applicant from leaving her home, and where the country of origin had ordered the applicant and her family to leave), *Gjyzi v. Ashcroft*, 386 F.3d 710, 712 (6th Cir. 2004) (finding persecution where applicant reported repeated assaults by the police following demonstrations, including a knifing and bayoneting, and threats by the secret police that he would "disappear"), *and Abay v. Ashcroft*, 368 F.3d 634, 640 (6th Cir. 2004) (finding that concrete threat of female genital mutilation on return to country may amount to persecution), *with Klawitter v. INS*, 970 F.2d 149, 152 (6th Cir. 1992) (no persecution when applicant alleged she was persecuted by a government official "who was interested in her sexually" and conceded that her "personal issue does not have anything to do with the government or change of government"), *Ivezaj v. INS*, 84 F.3d 215, 221 (6th Cir. 1996) (no persecution when applicants "belong[ed] to no political groups, and ha[d] never been jailed for political or religious activity"), *Mikhailevitch*, 146 F.3d at 390 (no persecution when applicant was questioned several times by the secret police but the record was devoid of evidence that the applicant "was physically abused, imprisoned, or arrested" because of the applicant's political beliefs), *Daneshvar v. Ashcroft*, 355 F.3d 615, 624 (6th Cir. 2004) (no persecution when, after spending five years in jail for political activities, the applicant served two years in the military and was subsequently able to obtain employment in the country), *Pilica v. Ashcroft*, 388 F.3d 941, 954 (6th Cir. 2004) (no persecution where applicant was twice arrested and detained after political demonstrations and once beaten by a policeman), *Mullai v. Ashcroft*, 385

F.3d 635, 639 (6th Cir. 2004) (no persecution where applicant was arrested after participating in protests, beaten and kicked by police and held without food and water for two days), *Ali*, 366 F.3d at 410 (applicant was arrested following demonstrations but "did not suffer persecution," because he "was instead involved in civil unrest between competing political factions" and "no evidence [indicated] that the police were conspiring with a rival political group").

Viewed from the vantage point of these cases, the Kacajs' claim bears the most similarity to the treatment experienced by the petitioners in *Pilica*, *Mullai* and *Ali*, each of which holds that arrests following political demonstrations and abuse at the hands of the police that does not require medical attention does not *compel* a finding of persecution. In *Mullai*, we denied a petition for review when the applicant was beaten by the police at a protest at which she gave a speech, twice jailed (once for one week and once "for two days without food or water"), threatened and fired from her job. 385 F.3d at 637. In *Pilica*, we held that the applicant had not shown persecution through his attendance at five demonstrations in which he held up signs, yelled and applauded; his week-long arrests following two of these demonstrations; and a beating at the hands of the police resulting in head injuries that required hospitalization. *See* 388 F.3d at 954. In *Ali*, the applicant "testified that he had been arrested and detained on two different occasions as a result of his participation in violent conflicts with members of opposing political parties," 366 F.3d at 409, but we denied his petition. As in *Mullai*, *Pilica* and *Ali*, Nush Kacaj's three arrests and his other experiences do not compel us to reverse the IJ's decision that the Kacajs had not faced past persecution in Albania. Each arrest, the record reveals, lasted for less than two days, and none of them produced injuries that

required medical attention. In the final analysis, just as in *Mullai*, *Pilica* and *Ali*, the Kacajs' claim is a step removed from our cases holding that the evidence compels a finding of past persecution (such as *Gjyzi* and *Ouda*), which require a past occurrence or past concrete threats of serious bodily injury on account of political opinion (or another statutory reason). *Accord Prasad v. INS*, 47 F.3d 336, 339 (9th Cir. 1995) (being struck during detention does not establish persecution); *Skalak v. INS*, 944 F.2d 364, 365 (7th Cir. 1991) (no persecution when applicant was twice detained for interrogations for three days each); *Zalega v. INS*, 916 F.2d 1257, 1260 (7th Cir. 1990) (no persecution when applicant was arrested three times); *Kubon v. INS*, 913 F.2d 386, 388 (7th Cir. 1990) (five days detention not persecution); *Mendez-Efrain v. INS*, 813 F.2d 279, 282–83 (9th Cir. 1987) (four days detention not persecution).

No less importantly, Kacaj has failed to show that the second and third arrests targeted *him* for persecution, as opposed generally to targeting groups of demonstrators for harassment. *See Gilaj v. Gonzales*, No. 03-4307, 2005 U.S. App. LEXIS 8327, at *18–20 (6th Cir. May 9, 2005) (looking to the "overall context of the applicant's situation to ascertain whether the applicant has been subjected to persecution" and noting that "[i]t is not sufficient that the applicant has been subjected to indiscriminate abuse, such as physical force or violence employed against a crowd of demonstrators," but rather "the applicant must establish that he or she was specifically targeted by the government for abuse based on one of the statutorily protected grounds"); *Pilica*, 388 F.3d at 955 ("[A]ll of the occurrences that arguably constitute past persecution resulted directly from Pilica's attendance at a demonstration rather than from the government having sought him out."); *Mullai*,

385 F.3d at 638 (denying petition where applicant's "treatment by the Communist government could be reasonably viewed as motivated by her status as a protester rather than religious persecution"); *Ali*, 366 F.3d at 410 (holding that injuries suffered during "civil unrest between competing political factions" do not compel a finding of persecution); *Ivezaj*, 84 F.3d at 221 (noting that evidence that an ethnic minority was persecuted "was insufficient to show a well-founded fear where the [ ] applicant for asylum could produce no evidence that he might be singled out for persecution"); *Daneshvar*, 355 F.3d at 625 (holding that the applicant had "presented no credible evidence that he will be singled out for different treatment if he is deported"). The injuries that Kacaj suffered while campaigning for the Democratic Party, likewise, appear to have resulted more from random acts of unrest rather than from any targeted persecution against him. And in light of Nush Kacaj's testimony that he did not know who committed the firebombing at his residence, the IJ's finding that Kacaj did not connect the firebombing to any persecution and that the firebombing could have resulted from general civil unrest was not unreasonable.

Nor does the letter submitted by Ambassador Ryerson to the IJ compel a different outcome. The letter candidly admits that Ambassador Ryerson "[did] not know Mr. Nush Kacaj well." JA 233. While the letter does extensively describe the political activities of Nush Kacaj's brother, detail the political climate in Albania and express Ambassador Ryerson's concern that Nush Kacaj "is likely to be the target of serious repressive measures if he were to return to Albania" because of his association with the Democratic Party, JA 236, we cannot say that the IJ's decision to rely on the other evidence in the record, rather than the Ambassador's letter, exceeds the bounds of deference

given to the IJ over these decisions. For one, Ambassador Ryerson's service in Albania ended in 1994, well before the transition in power in 1997, making the IJ's reliance on general country condition reports instead of the Ambassador's letter reasonable in light of the changed political climate in Albania. For another, our deference to the IJ's decision on this point is bolstered by the fact that the State Department has established specific procedures to permit current and former employees to provide opinion or expert testimony in criminal or civil proceedings. *See* 22 C.F.R. §§ 172.1, 172.4, 172.9. Because these procedures were not followed here, the IJ (and the government) did not have the opportunity to probe Ambassador Ryerson's assessment of the Kacajs' fear of future persecution.

Having failed to establish grounds to support a grant of asylum, the Kacajs have necessarily failed to meet the more stringent requirements for withholding of removal. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 424 (1987). And for many of the same reasons, the Kacajs have failed to show that the IJ committed reversible error in rejecting their claim for protection under the Convention Against Torture. *See Yu*, 364 F.3d at 703 n.3.

Finally, the Kacajs argue that the BIA misapplied its streamlining procedures in affirming the IJ's decision without opinion. *See* 8 C.F.R. § 1003.1(e)(4)(i). In response the government argues that we do not have jurisdiction to review this issue, *see ICC v. Brotherhood of Locomotive Eng'rs*, 482 U.S. 270, 280 (1987) (holding that "where a party petitions an agency for reconsideration on the ground of 'material error,' *i.e.*, on the same record that was before the agency when it rendered its original decision, 'an order which merely denies rehearing of . . . [the prior]

order is not itself reviewable'"), and that the BIA at any rate reasonably applied its own procedures.

Several courts of appeals have arrived at different conclusions on this issue and related issues.

*Compare Smriko v. Ashcroft*, 387 F.3d 279, 294 (3d Cir. 2004) (holding that the BIA's decisions

under 8 C.F.R. § 1003.1(e)(4)(i) of its streamlining provisions are reviewable), *Haoud v. Ashcroft*,

350 F.3d 201, 206 (1st Cir. 2003), *Chen v. Ashcroft*, 378 F.3d 1081, 1088 (9th Cir. 2004), *Carriche*

*v. Ashcroft*, 350 F.3d 845, 852–53 (9th Cir. 2003), *and Batalova v. Ashcroft*, 355 F.3d 1246, 1253

(10th Cir. 2004) (holding that the BIA's decisions under 8 C.F.R. § 1003.1(e)(5) are reviewable),

*with Tsegay v. Ashcroft*, 386 F.3d 1347, 1356 (10th Cir. 2004) (holding that decisions under

§ 1003.1(e)(4)(i) of the streamlining provisions are unreviewable), *and Ngure v. Ashcroft*, 367 F.3d

975, 983 (8th Cir. 2004). But as in several of our other cases, we need not address the issue here.

*See Hassan v. Gonzales*, 403 F.3d 429, 438 (6th Cir. 2005); *Zheng v. Ashcroft*, No. 03-3184, 2004

U.S. App. LEXIS 26607, at *5 (6th Cir. Dec. 20, 2004); *Denko v. INS*, 351 F.3d 717, 731–32 (6th

Cir. 2003); *cf. Tapucu v. Gonzales*, 399 F.3d 736, 743 (6th Cir. 2005). In our view, "the facts and

legal issues" of the case fit well "within the boundaries" of the Board's summary-affirmance

authority, and accordingly the Board did not err in invoking the streamlining procedure in this

instance. *Denko*, 351 F.3d at 732; 8 C.F.R. § 1003.1(e)(4)(i) (permitting the BIA to affirm without

opinion if "the result reached in the decision under review was correct" and the "issues on appeal

are squarely controlled" by precedent).

III.

For these reasons, we deny the petition.