NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0494n.06
Filed: June 10, 2005

**No. 04-3503**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| VERONIKA CELAJ, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | ON PETITION FOR REVIEW FROM THE |
| v. | ) | BOARD OF IMMIGRATION APPEALS |
| | ) | |
| ALBERTO GONZALES, | ) | |
| | ) | |
| Respondent-Appellee. | ) | |

Before:  CLAY and SUTTON, Circuit Judges; OBERDORFER, District Judge.[*]

SUTTON, Circuit Judge.  Veronika Celaj, an Albanian citizen, appeals (on behalf of herself and her two children) the denial of her application for asylum, withholding of removal and protection under the Convention Against Torture.  The Immigration Judge (IJ) denied her application, and the Board of Immigration Appeals (BIA) affirmed without opinion.  As the IJ's decision is supported by substantial evidence and as neither the IJ nor the BIA violated petitioner's due process rights, we affirm.

---

[*] The Honorable Louis F. Oberdorfer, Senior United States District Judge for the District of Columbia, sitting by designation.

I.

Veronika Celaj is a forty-year-old citizen of Albania who is married to Gjek Celaj, a high-ranking police official in Albania. In 1990, Mrs. Celaj gave birth to the couple's first child, a son.

On April 2, 1991, while Mr. Celaj was serving as vice chief of the police station in the city of Shkoder, a violent demonstration occurred that led to the deaths of four individuals. After the demonstration, the police arrested Mr. Celaj for "not using his authority properly" to prevent the violence. JA 76. He spent six years in jail, during which time he wrote five articles for Albanian newspapers proclaiming his innocence.

After his release from prison, he spent a short time at the couple's home in the city of Lezha. While there, Mrs. Celaj learned from a local police official that the police station had received an order from the Albanian Internal Affairs Ministry to take her husband back into custody. The official suggested that her husband leave town, prompting Mr. Celaj to go into hiding at the home of Mrs. Celaj's sister in Shkoder. During this time, Mrs. Celaj continued to live openly in Lezha.

On April 24, 1997, Mrs. Celaj, her husband and her son attempted to leave Albania for Italy. Before departing, Mrs. Celaj received a phone call from a man identifying himself as her husband's friend Eduard and asking to see her husband. She informed the man that her husband would be unable to meet him because the family was traveling to Shkoder later that day. On the way to the village from which they were to depart for Italy (which is near Shkoder), four armed men in a van,

all wearing masks, opened fire on the family. One shot hit Mrs. Celaj in the arm. She received treatment that day from a nurse and later required surgery.

When she reported the incident to the authorities, the police refused to investigate, claiming that the Albanian secret police—the SHIK—were involved in the shooting. Days later, she learned that none of her husband's friends had called the house on April 24, 1997.

After the incident, Mrs. Celaj returned to Lezha. Mr. Celaj returned to hiding at Mrs. Celaj's sister's house near Shkoder, then spent October 1997 through August 1999 at his sister's house in Italy. Mrs. Celaj gave birth to their second child, a daughter, in June of 1998. At some point while he was in hiding, Mr. Celaj began working on a book about the April 2, 1991, demonstrations that would exonerate him and that would blame high-ranking Albanian officials for the demonstrations and for the response to them. He eventually signed a deal with a company to publish the book, though he apparently has not yet published it (so far as the record shows). In June of 1997 and January of 1998, unknown individuals called Mrs. Celaj and threatened retaliation against her family if her husband ever spoke publicly about the events of April 2, 1991. In May of 2000, two people stopped her on the street and warned her that if her husband published his book, their family would be in danger.

This last threat prompted Mrs. Celaj to leave Albania for the United States on July 29, 2000, with her two children. Though the record does not specify the date of his arrival, Mr. Celaj was already in the United States when Mrs. Celaj received the May 2000 threat. Mrs. Celaj and her

children entered the United States on November 29, 2000, without proper documentation, and the INS began removal proceedings against them. They conceded removability, and Mrs. Celaj filed an application for asylum, withholding of removal and protection under the Convention Against Torture on behalf of herself and her children.

The IJ characterized her claim as one of "imputed political opinion" because she alleged persecution on the basis of her husband's political opinion. JA 30. He found her testimony credible but held that it failed to establish past persecution or a well-founded fear of future persecution. Among other reasons, he found that "respondent's own testimony is that she did not know who was responsible [for the shooting] and that there was much criminal activity at the time." JA 32. He thus concluded that Mrs. Celaj had failed to prove that she "was injured by the government or persons it could not control on account of her or her husband's political opinion." *Id.* He further found that "because others in Albania have criticized the April 1991 demonstrations and resulting trial, and the respondent herself received a passport while her husband was the subject of an outstanding warrant," Mrs. Celaj had failed to "demonstrate[] an objective basis for a well-founded fear of persecution[] should she return to Albania." JA 32–33. In the same vein, he rejected her claims for withholding of removal and protection under the Convention Against Torture. The BIA affirmed the IJ's decision without opinion.

II.

When the BIA affirms an IJ's decision without opinion, we review the IJ's decision. *See Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004). To be eligible for asylum, an alien must show that she is "unable or unwilling to return . . . to [her] country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). Such persecution must be at the hands of "the government[] or persons a government is unwilling or unable to control." *Pilica v. Ashcroft*, 388 F.3d 941, 950 (6th Cir. 2004). An applicant may make this showing in one of two ways. First, the applicant may "establish that he or she has suffered persecution," at which point there is a presumption of a well-founded fear of persecution. 8 C.F.R. § 208.13(b)(1). The burden then falls on the government to rebut the presumption by demonstrating that conditions in the applicant's country have changed such that "the applicant no longer has a well-founded fear of persecution." 8 C.F.R. § 208.13(b)(1)(i)(A). Second, an applicant may directly show that she possesses a well-founded fear of future persecution, *see* 8 C.F.R. § 208.13(b)(2), that is "both subjectively genuine and objectively reasonable," *Abay v. Ashcroft*, 368 F.3d 634, 637 (6th Cir. 2004).

We will uphold an IJ's factual determinations about whether an applicant qualifies as a refugee unless "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). "Section 1252(b)(4)(B) basically codifies the Supreme Court's substantial

evidence standard," *Yu*, 364 F.3d at 702, which requires us to uphold the IJ's decision if it is "supported by reasonable, substantial, and probative evidence on the record as considered as a whole," *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992).

In attempting to show past persecution, Mrs. Celaj testified as an initial matter to three threats (two by telephone, one in person) in which individuals warned her that her husband should not speak or write publicly about the events of April 2, 1991, and that if he did so he would place his family in peril. With respect to the phone calls, however, she did not know the identities of the callers and thus could not show that "the government" or "persons" the "government is unwilling or unable to control" were responsible for the incident. *Pilica*, 388 F.3d at 950. With respect to the in-person threat, she did not show that it was acted upon. And, as the IJ correctly reasoned, threats alone cannot form the basis for past persecution. Persecution "requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty." *Mikhailevitch v. INS*, 146 F.3d 384, 390 (6th Cir. 1998) (finding no persecution arising from repeated threats by the KGB that it would put the applicant in prison or place his "life . . . in danger"); *see Pilica*, 388 F.3d at 954.

Perhaps her most arresting piece of persecution evidence comes from the April 24, 1997, incident when masked men opened fire on her, her husband and her son as they attempted to reach the Italian border. No doubt, this incident involved more than a mere threat, as Mrs. Celaj and her family were not only put in peril but she also suffered a physical injury from the attack. Again, however, she acknowledged that she did not know the identity of the masked men and that the attack

occurred at a time when there was rampant private criminal activity in Albania. The only evidence purporting to tie the attack to the government (or people that the government was unable or unwilling to control) was that a local police officer (who also happened to be a friend of the family) told her that the people involved in the attack were connected with the SHIK. But she acknowledged that she did not know how the officer knew that members of the SHIK were involved. Given that the only evidence in the record tying the attack to the SHIK is the uncorroborated hearsay statement of a police officer (and family friend)—the basis of whose knowledge is unknown to Mrs. Celaj—we cannot say that this is a case in which the applicant's evidence was "so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *Elias-Zacarias*, 502 U.S. at 483–84.

Attempting to rebut this conclusion, Mrs. Celaj points out that the IJ found her credible, then contends that the evidence compelled the IJ to conclude that the SHIK was involved in the incident. But even if the IJ believed that a police officer told her that the SHIK was involved, he was not required to give that statement controlling weight in determining whether the government was involved in the attack. It was a hearsay statement from a police officer who was never named, whose basis of knowledge was never explained and who never conducted an investigation into the matter. Several other individuals, the evidence also showed, have spoken publicly and critically about the way that the Albanian government handled the demonstration on April 2, 1991, but have not been harmed by the government—at least so far as Mrs. Celaj's testimony and evidence are concerned. Under these circumstances, the evidence does not compel us to conclude that the IJ erred

in deciding that Mrs. Celaj failed to show that she had been persecuted by the government based on her husband's political opinion.

Neither has Mrs. Celaj demonstrated a well-founded fear of future persecution. While she fears persecution if her husband publishes his book or speaks publicly about the April 1991 events, she acknowledged that others have spoken publicly and published books and articles about the events without consequence. And while her husband wrote published articles from prison about the April 1991 events, Mrs. Celaj lived openly and unharmed in Albania. This evidence does not compel the conclusion that the IJ erred in concluding that Mrs. Celaj did not "demonstrate[] an objective basis for a well-founded fear of persecution[] should she return to Albania." JA 33.

Having failed to demonstrate eligibility for asylum, Mrs. Celaj has necessarily failed to meet the more stringent requirements for withholding of removal. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 424 (1987). And for many of the same reasons that Mrs. Celaj has failed to show eligibility for asylum, she has not met her burden of proving that it is "more likely than not" that she would be tortured if removed to Albania. 8 C.F.R. § 208.16(c)(2); *see Yu*, 364 F.3d at 703 n.3. Indeed, Mrs. Celaj has not offered any independent reasons why the IJ's conclusion on this point should be treated differently from his conclusion on the other claims.

III.

Mrs. Celaj separately argues that the BIA violated her due process rights when it affirmed the IJ's decision without opinion because it failed to conduct a meaningful review of her claim. *See* 8 C.F.R. § 1003.1(e)(4)(i). This court has already decided that the BIA's streamlining procedures do not violate due process. *See Denko v. INS*, 351 F.3d 717, 730 (6th Cir. 2003). The invocation of those procedures by itself thus does not violate this constitutional guarantee.

As for Mrs. Celaj's claim that the BIA misapplied those procedures in her case, it is not clear whether this court has statutory jurisdiction to entertain such a claim. *See ICC v. Brotherhood of Locomotive Eng'rs*, 482 U.S. 270, 280 (1987) (holding that "where a party petitions an agency for reconsideration on the ground of 'material error,' *i.e.*, on the same record that was before the agency when it rendered its original decision, 'an order which merely denies rehearing of . . . [the prior] order is not itself reviewable'"); *Kacaj v. Gonzales*, No. 04-3054, 2005 U.S. App. LEXIS 8978, at *16–18 (6th Cir. May 17, 2005) (discussing circuit split on issue). But, as we have concluded in other cases, we need not resolve that issue today. *See Hassan v. Gonzales*, 403 F.3d 429, 438 (6th Cir. 2005); *Denko*, 351 F.3d at 732 ("[F]or many streamlined cases 'it makes no practical difference whether the BIA properly or improperly streamlined review of [an asylum applicant's] case' because when 'we review directly the decision of the IJ when a case comes to us from the BIA pursuant to [its affirmance-without-opinion procedure], our ability to conduct a full and fair appraisal of [the applicant's] case is not compromised.'" (quoting *Georgis v. INS*, 328 F.3d 962, 967 (7th Cir. 2003)).

Here, Mrs. Celaj does not appear to argue that her case amounted to a "novel factual situation" or that her case was not "squarely controlled" by existing precedent. *See* 8 C.F.R. § 1003.1(e)(4)(i). Her main argument appears to be that the IJ incorrectly assessed the facts and misapplied the law. As we have already shown, however, the IJ did not err in either respect, a conclusion that undermines her claim that the BIA misapplied its own streamlining regulations and a conclusion that forecloses the claim that she was prejudiced by any misapplication of the streamlining provisions.

Nor do we agree with Mrs. Celaj that the "IJ and the BIA misused, disregarded and/or distorted substantial evidence submitted in denying petitioner's claims for asylum and withholding of removal to the point of denying petitioners due process." Celaj Br. at 19. "A violation of due process occurs when the proceeding was so fundamentally unfair that the alien was prevented from reasonably presenting his case." *Hassan*, 403 F.3d at 435 (quotations omitted). In support of her due process claim, Mrs. Celaj does not take issue with any aspect of the hearing or its fairness. She points to no defect in the procedure but only to defects in the judgments of the IJ and the BIA. Even if the IJ and BIA had erred in their determination of the facts or in their application of the law—which, as shown, did not occur—that would at best require a reversal on the merits, not a finding that Mrs. Celaj was denied a full and fair hearing in violation of procedural due process.

IV.

For these reasons, we deny the petition for review.