**NOT RECOMMENDED FOR PUBLICATION**

File Name: 05a0944n.06

Filed: November 30, 2005

**No. 04-3465**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILO MADILU,

      Petitioner,

v.

ALBERTO R. GONZALES,
ATTORNEY GENERAL

      Respondent.

                                    /

ON APPEAL FROM THE BOARD OF
IMMIGRATION APPEALS

BEFORE:    SILER and CLAY, Circuit Judges; MILLS, District Judge.[*]

      **CLAY, Circuit Judge**.  Petitioner Filo Madilu appeals the affirmance by the Board of Immigration Appeals ("BIA") of an immigration judge's order which denied Petitioner's claims for 1) asylum pursuant to the Immigration and Naturalization Act ("INA") section 208(a), 8 U.S.C. § 1158(a); 2) withholding of removal pursuant to INA section 241(b)(3), 8 U.S.C. § 1231(b)(3); and 3) withholding of removal under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("Torture Convention"). Petitioner also challenges the BIA's use of the summary affirmance procedure, arguing that its use in the instant case

---

[*]Honorable Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

contradicts BIA's own regulations on the subject.

For the following reasons, this Court denies the petition for review in all respects.

## BACKGROUND

### I.     Procedural History

The Immigration and Naturalization Service ("INS") commenced removal proceedings against Petitioner after Petitioner entered the United States without inspection on July 7, 1999. Petitioner conceded removability at a hearing held on January 18, 2001, but requested 1) asylum pursuant to INA section 208(a), 8 U.S.C. § 1158(a); 2) withholding of removal pursuant to INA section 241(b)(3), 8 U.S.C. § 1231(b)(3); 3) withholding of removal under the Torture Convention; and 4) voluntary departure in the alternative. An immigration judge denied Petitioner all requested relief at a December 9, 2002 hearing.

Petitioner timely appealed the immigration judge's order to the BIA, which affirmed the order without opinion on March 18, 2004. Petitioner timely appealed the BIA's decision to this Court on April 14, 2004.

### II.    Substantive Facts

Petitioner is a male native and citizen of the Democratic Republic of Congo who entered the United States without inspection on July 7, 1999. Petitioner testified that his father was a political ally of former Congolese President Mobutu. Petitioner stated that his father was heavily involved in the election of Mobutu to the Congolese presidency and was rewarded for his political support with political patronage and the mayorship of a locality in Petitioner's home region of Kinshasa, which position Petitioner's father held from 1988 to 1994.

2

Petitioner asserts that in 1994, at the onset of growing political unrest in the Democratic Republic of Congo, Petitioner's father left his mayorship to become a personal advisor to President Mobutu, a position Petitioner's father appeared to hold until the overthrow of Mobutu's government in May 1997. Petitioner testified that on May 11, 1997, on Petitioner's 25th birthday, Petitioner's father took Petitioner and Petitioner's sister and brother into the nearby Republic of Congo, which is also known as Brazzaville. After leaving Petitioner and his sister in Brazzaville, Petitioner's father then returned to the Democratic Republic of Congo to continue his work on behalf of and with President Mobutu. Counsel for the United States points out that in his initial application for asylum, Petitioner indicated that the date on which he last left his country was "unknown." Prior to signing and swearing to his application, however, Petitioner corrected the date to May 11, 1997.

Shortly after Petitioner's arrival in Brazzaville, President Mobutu fled the Democratic Republic of Congo and rebel forces took control of Kinshasa. Petitioner states that while in Brazzaville, Petitioner heard that the then-mayor of Kinshasa had been burned alive by rebels. Petitioner states that he has not heard from his father since a few telephone calls shortly after his father left Petitioner and Petitioner's sister and brother in Brazzaville.

Petitioner testified that Petitioner has not seen or been in contact with his mother since fleeing the Democratic Republic of Congo. Petitioner stated that his mother was abroad in Belgium at the time on a business trip, one of many trips Petitioner's mother took to buy jewelry for her business. Petitioner asserted in his asylum application that prior to the political unrest in his country, his mother had been grooming him to take over her business. Petitioner, however, did not have any information on his mother's contacts or whereabouts in Belgium. In Petitioner's affidavit

accompanying his asylum application, Petitioner characterized his mother's business as "a large importing company." Later, on cross examination, Petitioner stated that his mother's business was buying jewelry abroad and selling it at local markets, but that only his mother and he worked in the business.

Petitioner testified that he remained in Brazzaville for two years before seeking transport to the United States, but that he did not wish to stay in Brazzaville because of security concerns. After securing transport on a smuggling ship, Petitioner arrived in Baltimore on July 7, 1999. Petitioner stated that although the trip took six to seven weeks, he could not identify the ship by name or country because he was kept below decks the entire trip. Petitioner could not remember how much he paid the smugglers, but estimated that for Petitioner and the other smuggled passengers the total was around $300,000 "CFA Francs." Upon arriving in Baltimore, Petitioner says he was given a worker's uniform and instructed on how to leave the ship and avoid immigration inspection.

On Petitioner's asylum application, Petitioner answered "No" to the question of whether he or any member of his family had ever been arrested in the United States. When asked during cross-examination if he had ever been arrested in the United States, Petitioner again answered "No." When United States counsel told Petitioner that the government had an "ident" saying that Petitioner had been arrested, Petitioner answered "If you are certainly sure that I was arrested, I will look at it and tell you exactly what this was." (J.A. at 113.)

Petitioner's counsel objected to the government's use of the document evidencing Petitioner's arrest without prior submission and, ostensibly, authentication. Government counsel asserted that the document was used as a good faith basis for asking Petitioner about previous

arrests. The immigration judge permitted government counsel's use of the arrest documentation in this limited regard but disallowed the document's submission into evidence.

Government counsel then pursued the topic and asked Petitioner if he had ever used false identification in an attempt to get a driver's license; Petitioner admitted that he "tried one time but, is [sic] was not my fault." (J.A. at 118.) Petitioner admitted to paying a man $300 for documents to help Petitioner procure a driver's license. When Petitioner attempted to use those documents, however, Petitioner stated that "they came to arrest me." (J.A. at 122.) Petitioner testified that he asked the policemen at the time, "why are you arresting me?" (J.A. at 122.) Petitioner's counsel subsequently objected to government counsel's questioning about the arrest, asserting that the government had failed to establish that Petitioner had been actually arrested. The immigration judge overruled counsel's objection, finding that Petitioner had made an in-court confession to the arrest, for which no corroboration was necessary.

After the arrest, Petitioner was taken to a "small, small room" for some period of time, fingerprinted, and then released. (J.A. at 124.) Charges against Petitioner were never pursued. Petitioner asserted that he had misunderstood the question on the asylum application, filled out with the assistance of his legal representation, to ask whether he had ever been arrested "here" in Cincinnati, not in the United States more broadly. (J.A. at 148.) Petitioner did not proffer an explanation of why he initially answered "no" when asked on cross examination whether he had ever been arrested in the United States.

Petitioner presented corroborating evidence in the form of a birth certificate with government certification from the region of Kinshasa dated 1999, a letter of good standing dating from 1999

from the then-mayor of Kinshasa, and pictures assertedly of his mother, family, and friends. In addition, Petitioner submitted a facsimile of a letter from his sister in Paris.

Petitioner testified that he had been in regular telephone contact with his sister, who had sought asylum in France. The facsimile spoke to his sister's desire to reunite with Petitioner, the "only family [I] have left." (J.A. at 175.) Petitioner additionally testified that his sister had to leave Petitioner's brother in Mozambique when she traveled to Paris about nine months prior to Petitioner's immigration hearing.

Petitioner testified that no harm had ever been threatened against him in his native country, but that he had heard that followers of Mobutu were persecuted by the current regime. Petitioner asserts that were he to return to his country, his life would be in danger because of the known association of Petitioner's father with former President Mobutu. When asked if there were places in his country where Petitioner could return where his father's past association was unknown, Petitioner indicated that because his past life was in Kinshasa, that is where he would return, if safe to do so, but that opponents of former President Mobutu were in all parts of the country.

## DISCUSSION

Petitioner challenges the immigration judge's factual findings of credibility and past persecution; these factual elements go directly to Petitioner's claims for asylum and withholding of removal under the INA. Petitioner does not argue upon appeal, however, that the immigration judge erred in finding that Petitioner does not qualify for withholding of removal under the Torture Convention. This Court therefore addresses Petitioner's first two assignments of error as they relate to the INA claims. Petitioner also challenges the BIA's use of the summary affirmance procedure

as inappropriate and contrary to BIA's own regulations in this case.

## I.     SUBSTANTIAL EVIDENCE SUPPORTS THE IMMIGRATION JUDGE'S FINDING THAT PETITIONER WAS NOT CREDIBLE AND HAD FAILED TO DEMONSTRATE PAST PERSECUTION

### *Standard of Review*

When the BIA summarily affirms the decision of an immigration judge, this Court reviews the immigration judge's decision directly. *Abay v. Ashcroft*, 368 F.3d 634, 638 (6th Cir. 2004). This Court reviews final removal orders of the BIA for support by substantial evidence. *Mikhailevitch v. INS*, 146 F.3d 384, 388 (6th Cir. 1998). Under this standard of review, this Court will overturn an order for removal only if "any reasonable adjudicator would be compelled to conclude to the contrary." *Yu v. Ashcroft*, 364 F.3d 700, 703 (6th Cir. 2004) (referencing the language of 8 U.S.C. § 1252(b)(4)(B)).

Credibility and persecution determinations in removal hearings, as findings of fact, are reviewed under the same substantial evidence standard. *See* 8 U.S.C. § 1252(b)(4)(B) (2000). This Court affords substantial deference to an immigration judge's adverse credibility finding, but the "finding must be supported by specific reasons." *Sylla v. INS*, 388 F.3d 924, 925 (6th Cir. 2004). "[M]inor and irrelevant inconsistencies cannot constitute the basis for an adverse credibility determination." *Id.* at 926. At the same time, for this Court to overturn the BIA when the immigration judge has properly articulated the basis for the adverse credibility finding, the evidence must be such that "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B) (2000); *see also Yu*, 364 F.3d at 703.

### *Analysis*

**A.    The Immigration Judge Listed Specific Reasons Underlying the Adverse Credibility Determination**

The immigration judge found Petitioner's testimony "very, very suspect. His application is vague. His testimony is vague and . . . his corroborative documents demonstrate more questions about [Petitioner's] verity and credibility than they solve in his favor." (J.A. at 22.) While the immigration judge acknowledged that asylum seekers may, at times, succeed without the benefit of corroborating evidence, the judge further noted that applicants must satisfy an "affirmative duty to corroborate their claim or otherwise reasonably explain their failure to do so." (J.A. at 25.)

The immigration judge found the following aspects of Petitioner's case suspect:

*    Petitioner's birth certificate and certificate of good standing were issued in 1999, after Petitioner fled the country and by a government ostensibly hostile to Petitioner.

*    Petitioner waited until shortly before the hearing before procuring the facsimile from his sister, despite the fact that Petitioner had been represented by the same law firm for three years.

*    The facsimile from Petitioner's sister was not a statement made under oath and was not an original document.

*    The facsimile from Petitioner's sister made no mention of Petitioner's father, his father's position in the government, or his family's former financial position in the former Zaire.

*    The facsimile from Petitioner's sister said Petitioner was "her only family" in contradiction to Petitioner's testimony that his sister had left their brother in Mozambique.

*    Petitioner falsely stated that he had never been arrested in his asylum application.

*    Petitioner falsely testified that he had never been arrested, only to admit to a prior arrest after government counsel presented documentation showing a good faith basis for its inquiry.

*    Petitioner could not at first remember when he first entered the United States but

8

later amended his application to May 11, 1997.

*   Petitioner's asylum application did not include any information on Petitioner's two years in Brazzaville or his trip to the United States.

*   Petitioner was unable to offer any corroboration of his father's position with the Mobutu government.

*   Petitioner represented his mother's company as a large importing company but later admitted that he and his mother were the only employees.

*   Petitioner stated that he was "on tap" to take over his mother's business, at the age of 25, but had been unable to locate his mother in Belgium.

*   Petitioner's asylum application did not mention that his father's replacement as mayor of Kinshasa was burned alive.

*   Petitioner was unable to identify the flag under which the ship which transported Petitioner to the United States sailed.

The immigration judge concluded his assessment of the evidence before him:

Again, the Court notes because of the torpedoing statement of his sister, the lack of corroboration, his inconsistencies between his application and his testimony[,] [a]nd his demonstrable lie on cross-examination nothing that respondent says can be relied upon and he flat hasn't sustained his burden of proof and the Court's going to deny all his applications.

(J.A. at 36-37.)

**B.      The Evidence Does Not Compel This Court to "Conclude to the Contrary"**

Taken individually, the inconsistencies and omissions which so bothered the immigration judge would present little factual basis for an adverse credibility determination. This Court, however, reviews the record in its entirety. Taken together, the omissions, inconsistencies, and vagaries of Petitioner's version of events constitute substantial evidence such that this Court is not "compelled to conclude to the contrary." *See Yu*, 364 F.3d at 703.

9

Even were this Court to conclude that the immigration judge had unjustifiably relied on these difficulties with Petitioner's application, the clear impeachment of Petitioner on the stand would be sufficient, standing alone, for a trier of fact to make an adverse credibility determination. Petitioner asserted in his asylum application that he had never been arrested and continued to take this position on the stand. Once confronted by government counsel, however, Petitioner admitted to having been arrested. Petitioner's explanation that the fault lay on his legal representative in filling out his application for asylum itself is inconsistent with the fact that the question on cross-examination was directly to him, through a certified translator (about whom Petitioner does not complain), and asked whether Petitioner had ever been arrested *in the United States*.[1]

**C.      The Past Persecution Finding Was Derivative of the Credibility Determination**

Petitioner additionally argues that substantial evidence fails to support the immigration judge's finding that Petitioner had failed to demonstrate past persecution. Petitioner argues as if the immigration judge's finding that Petitioner had failed to demonstrate past persecution were based on a detailed assessment of Petitioner's evidence with the presumption of Petitioner's credibility. This was not the case. Almost all of the immigration judge's opinion focuses on the judge's perception of the evidence before him and the judge's attendant finding on credibility. After concluding that Petitioner's application would be denied because of his lack of credibility, the immigration judge stated:

> Assuming, arguendo, however, that respondent has demonstrated he's from the

---

[1]Petitioner does not assert, on appeal, that the immigration judge erred in permitting the line of questioning regarding arrest or the use of the assessment memorandum to establish a good faith basis for the questioning, at least insofar as the credibility determination goes.

Democratic Republic of the Congo, the Court notes that there is no pattern or practice of persecution of a group of persons similarly situated to him.
. . . .
And even if you believe most of his stories if not all of his story, the Court would still deny his application.

(J.A. at 37.)

The immigration judge therefore did not make detailed findings on whether, if credible, Petitioner had presented sufficient evidence to prove past persecution. Rather, the immigration judge based his past persecution finding on his substantiated adverse credibility determination. The past persecution finding, by extension, is therefore supported by substantial evidence.

## II.    THE BIA'S SUMMARY AFFIRMANCE DID NOT VIOLATE PROMULGATED BIA REGULATIONS ON THE PROCEDURE

This Court has so far declined to decide whether this Court has statutory jurisdiction to decide a claim for BIA's misapplication of its own procedures. *See ICC v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 280 (1987) (holding that "where a party petitions an agency for reconsideration on the ground of 'material error,' i.e., on the same record that was before the agency when it rendered its original decision, an order which merely denies rehearing of . . . [the prior] order is not itself reviewable"); *see also Kacaj v. Gonzales*, No. 04-3054, 2005 U.S. App. LEXIS 8978, at *16-18 (6th Cir. May 17, 2005) (discussing circuit split on issue). But, as this Court has concluded in other cases, the Court need not resolve the issue with the case at hand. *See Hassan v. Gonzales*, 403 F.3d 429, 438 (6th Cir. 2005); *Denko v. INS,* 351 F.3d 717, 732 (6th Cir. 2003) ("For many streamlined cases 'it makes no practical difference whether the BIA properly or improperly streamlined review of [an asylum applicant's] case' because when 'we review directly the decision of the [immigration judge] when a case comes to us from the BIA pursuant to [its

11

affirmance-without-opinion procedure], our ability to conduct a full and fair appraisal of [the applicant's] case is not compromised.'" (quoting *Georgis v. Ashcroft*, 328 F.3d 962, 967 (7th Cir. 2003))).

Petitioner argues that the BIA's use of summary affirmance violated 8 C.F.R. section 1003.1(e)(4), which permits affirmance without opinion if:

> the Board member determines that the result reached in the decision under review was correct; that any errors in the decision under review were harmless or nonmaterial; and that (A) The issues on appeal are squarely controlled by existing Board or federal court precedent and do not involve the application of precedent to a novel factual situation; or (B) The factual and legal issues raised on appeal are not so substantial that the case warrants the issuance of a written opinion in the case. *See* 8 C.F.R. § 1003.1(e)(4)(i).

Here, Petitioner does not appear to argue that her case amounted to a "novel factual situation." *See* 8 C.F.R. § 1003.1(e)(4)(i). Rather, Petitioner argues that the facts were in dispute. (*See* Pet'r. Br. at 25.) The relevant code provisions do not preclude summary affirmance, however, when the parties dispute the facts. Indeed, almost all asylum applications will involve factual disputes. Moreover, Petitioner disputes only the conclusions drawn from the evidence before the immigration judge, a review of which this Court undertakes above.

Petitioner additionally argues that a "substantial legal issue was raised in Petitioner's BIA appeal regarding the Service's use of what was alleged to be an inadmissible document." (Pet'r. Br. at 25.) If the use of the document as a basis to pursue the arrest line of questioning presents a substantial legal issue, then the regulation may call for panel review. Petitioner does not explain, however, why the immigration judge's allowance of the arrest memorandum presents a "substantial legal issue" through reference to any statute or case law. Because Petitioner gives no more than a

perfunctory and conclusory statement on the underlying "substantial legal issue," without reference to law, this Court deems the issue waived for appellate review. *See United States v. Layne*, 192 F.3d 556, 566 (6th Cir. 1999).

## CONCLUSION

For the foregoing reasons, this Court denies the petition for review.