**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 09a0407n.06**

No. 08-3950

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Jun 05, 2009**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| DATESJ PATEL-MANJULABEN, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | ON PETITION FOR REVIEW FROM |
| | ) | THE BOARD OF IMMIGRATION |
| ERIC H. HOLDER, JR, United States | ) | APPEALS |
| Attorney General, | ) | |
| | ) | |
| Respondent. | ) | |

Before: MARTIN, RYAN and SUTTON, Circuit Judges.

SUTTON, Circuit Judge. Datesj Patel-Manjulaben, a native and citizen of India, seeks review of an order of the Board of Immigration Appeals (BIA) dismissing his appeal from an Immigration Judge's (IJ) decision denying his applications for asylum, withholding of removal and relief under the Convention Against Torture. For the reasons that follow, we deny the petition for review.

I.

In January 2001, Patel-Manjulaben, a Hindu, lived with his parents on his family's farm in Anjar, India. An earthquake struck the town that month, tragically killing his parents and leaving Patel-Manjulaben, age 24, as the caretaker of the farm. Not long after the earthquake, a group of Muslim men began to "harass[]" Patel-Manjulaben in an attempt to coerce him into giving them the farm. ROA 112. On February 13, 2001, a group of "[a]bout eight" Muslim men attacked Patel-

Manjulaben on a bus, striking him once on the back and once on the chin. ROA 113. Patel-Manjulaben reported the incident to the local police, who told him that the men "w[ould] not do it again." ROA 115.

The police report, however, provoked a second incident. On February 20, 2001, the same group of Muslim men threatened Patel-Manjulaben, telling him that they would kill him if he filed another police report. Faced with these problems, Patel-Majulaben chose to sell the farm, left Anjar on April 1, 2001, and left India altogether later that month.

A year (or so) later, Patel-Manjulaben unlawfully entered the United States. Immigration officials apprehended him, and the government initiated removal proceedings against him. Conceding removability, Patel-Manjulaben filed applications for asylum, withholding of removal and relief under the Convention Against Torture.

After a hearing, the IJ denied Patel-Manjulaben's applications. Although the IJ found Patel-Manjulaben credible, he concluded that Patel-Manjulaben did not establish past persecution because the attack and the threat did not "rise[] to the level of persecution under U.S. asylum law" and the acts at any rate were not "done to him by the Government of India or by persons that the Government of India is unwilling or unable to control." ROA 56–67. The IJ also concluded that Patel-Manjulaben could not establish a well-founded fear of future persecution because he reasonably could relocate to another part of India where Hindus were in the majority or where there was no tradition of Hindu-Muslim violence.

The BIA rejected Patel-Manjulaben's appeal, agreeing with the IJ in all respects and adding that Patel-Manjulaben had failed to show that the beating and the threat "were on account of his Hindu religion." ROA 2. The BIA also rejected Patel-Manjulaben's claim that his removal-hearing transcript was constitutionally defective, concluding that he "ha[d] not shown that he was actually prejudiced or prevented from reasonably presenting his claims for relief." ROA 2.

## II.

To be eligible for asylum, an applicant must prove that he is unable or unwilling to return to his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). Where, as here, the BIA affirms the IJ's decision but adds commentary of its own, we "directly review the decision of the IJ while considering the additional comment[s] made by the BIA." *Gilaj v. Gonzales*, 408 F.3d 275, 283 (6th Cir. 2005). We must accept the IJ's and BIA's findings "unless any reasonable adjudicator would be compelled to conclude to the contrary," 8 U.S.C. § 1252(b)(4)(B)—unless, that is, the evidence "not only *supports* [reversal], but *compels* it," *INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992).

The IJ determined that Patel-Manjulaben "failed to show either past persecution or a well founded fear of future persecution." ROA 56. Substantial evidence supports both conclusions.

A.

Start with the claim that Patel-Manjulaben suffered past persecution.  Persecution requires more than harassment, verbal intimidation or random crime.  Although a single incident may suffice if it is sufficiently severe, *see Mohammed v. Keisler*, 507 F.3d 369, 371 (6th Cir. 2007), the mere fact that the applicant suffered physical injury does not establish persecution, *see Gilaj*, 408 F.3d at 284.  A cognizable claim of persecution may stem from improper government conduct or from individuals the government is "unwilling or unable to control."  *Khalili v. Holder*, 557 F.3d 429, 436 (6th Cir. 2009).  And the applicant must show that he was "targeted" for abuse because he belongs to a protected group.  *Gilaj*, 408 F.3d at 285.

Patel-Manjulaben falls short on each front.  *First*, the record does not compel the conclusion that the two incidents—the attack on the bus and the death threat—amount to "persecution."  Neither incident, standing alone, suffices:  A single instance of physical abuse or verbal intimidation do not necessarily amount to persecution.  *See Gjokic v. Ashcroft*, 104 F. App'x 501, 505 (6th Cir. 2004); *Mikhailevitch v. INS*, 146 F.3d 384, 390 (6th Cir. 1998).

Nor do the two incidents, standing together, compel a finding of persecution.  By Patel-Manjulaben's own account, the attack was relatively mild:  He was struck twice, and he did not seek medical treatment.  And little came of the death threat:  Patel Manjulaben remained in the village for more than a month after the threat, and he had no other problems with the Muslim men.  Patel-Manjulaben himself described the two incidents as "harass[ment]," ROA 112, and we have held that similar, indeed more severe, acts do not establish persecution.  *See, e.g., Mohammed*, 507 F.3d at 371

- 4 -

(6th Cir. 2007) (finding of persecution not compelled where petitioner was held in police custody for three days and slapped once and kicked once); *Lumaj v. Gonzales*, 462 F.3d 574, 577 (6th Cir. 2006) (same where petitioner was attacked and beaten during a kidnaping attempt); *Pilica v. Ashcroft*, 388 F.3d 941, 954 (6th Cir. 2004) (same where petitioner was detained for two week-long periods and, in a third incident, beaten by police, resulting in head injuries and a week-long hospital stay); *Mullai v. Ashcroft*, 385 F.3d 635, 637–39 (6th Cir. 2004) (same where petitioner was beaten and kicked by police and detained in a jail for two days without food or water); *see also Kacaj v. Gonzales*, 132 F. App'x 584, 585, 587–88 (6th Cir. 2005) (same where petitioner was arrested three times and, on the third occasion, was beaten with rubber truncheons and hit and kicked by officers). In view of these precedents, we cannot say that these two incidents *compel* a finding of persecution.

*Second*, substantial evidence supports the IJ's conclusion that the Indian government was not "unable or unwilling" to control the men who attacked Patel-Manjulaben. The day after he was attacked, Patel-Manjulaben went to the police station and filed a report. The police told him that the men would "not do it again" and would "not do anything" else to him, ROA 115—suggesting that, instead of looking the other way, the police would take steps to ensure that Patel-Manjulaben was protected. What followed suggests that the police meant what they said: The Muslim men did not attack Patel-Manjulaben again, and his attackers warned him not to file another police report, a warning suggesting that the law enforcement efforts were having effect. *See Gromovik v. Gonzales*, 148 F. App'x 479, 482 (6th Cir. 2005); *Koshkina v. Gonzales*, 135 F. App'x 824, 827 (6th Cir. 2005).

The evidence, it is true, fails to show whether the police ever arrested anyone for the attack. But even if the police never made an arrest, that does not mean the police were unable or unwilling to help. *See Ingmantoro v. Mukasey*, 550 F.3d 646, 650 (7th Cir. 2008). That he was spared a second assault suggests that the police were doing their job.

Patel-Manjulaben, it is also true, stated in his asylum application (though not at the hearing) that the police sergeant in his village is "Muslim and . . . condones or ignores the persecution of Hindus." ROA 227. But Patel-Manjulaben never developed the point or indeed explained how it is consistent with the warning that he not file another police report. On this record, the evidence simply does not compel the finding that the relevant Indian (or local) government was unable or unwilling to protect him.

*Third*, substantial evidence supports the BIA's conclusion that Patel-Manjulaben was not mistreated "on account of" his religion. As the BIA viewed the record, it showed that his assailants wanted his farm, not to attack him on account of his religion. Patel-Manjulaben himself acknowledged that the attackers demanded that he give them the farm and that the same group harassed "three to four" other families—of an unspecified religion—over their land as well. ROA 121. The theory that the attackers were run-of-the-mill bandits, as opposed to men engaged in religious wars, is supported by the timing of the attack and threat. Patel-Manjulaben was a natural target for their scheme. His parents had just died, and he was left alone to manage the farm at age 24. The "problems" that Patel-Manjulaben had with the group of Muslim men, indeed, stopped after he sold

the farm in late February 2001.  Although Patel-Manjulaben remained in his village for another month, he does not allege that he was subjected to any other acts of abuse or intimidation.

Attempting to rebut the BIA's conclusion, Patel-Manjulaben points to circumstantial evidence: that he lived in a majority-Muslim village, that his attackers were Muslim and that he is Hindu.  But while those correlations might provide sufficient grounds for a reasonable adjudicator to find that Patel-Manjulaben's attackers were motivated to persecute him because of his religious beliefs, they alone are not "so compelling that no reasonable factfinder could fail to" draw such a conclusion. *Elias-Zacarias*, 502 U.S. at 484.  Because we cannot "state with conviction what motivated the purported persecutor[s], [we] must defer to the BIA's own finding." *Zoarab v. Mukasey*, 524 F.3d 777, 780 (6th Cir. 2008) (internal quotation marks omitted).

B.

In the absence of a finding of past persecution and without the presumption of future persecution that comes with it, *see* 8 C.F.R. § 1208.13(b)(1), Patel-Manjulaben faces an uphill battle in showing "an objectively reasonable possibility of persecution if forced to return" to India, *Rreshpja v. Gonzales*, 420 F.3d 551, 556 (6th Cir. 2005).  Patel-Manjulaben, as noted, has not shown that the relevant Indian government is unable or unwilling to protect Hindus from religious persecution, even in majority-Muslim sections of the country.  Although the Department of State reports that tensions between religious group is a problem in "some places," it also reports that the "the vast majority of Indians of every religious creed live[] in peaceful coexistence." ROA 181.  What religious violence

there has been in Patel-Manjulaben's home state of Gujarat, moreover, has been directed primarily at Muslims, who are a minority there.

Even if Patel-Manjulaben had established a well-founded fear of future persecution in his home village, Patel-Manjulaben reasonably could have "avoid[ed] persecution by relocating to another part of [his] country." 8 C.F.R. § 1208.13(b)(2)(ii). If Patel-Manjulaben's problem is living in a Hindu-minority area of India, it is not self-evident why moving to the United States is the answer. Eighty percent of India's population is Hindu, and Muslims form a majority of just one of India's 28 states. Patel-Manjulaben, quite feasibly, could relocate to another village or town where Hindus are in the majority.

Relocation is not a reasonable option for him, Patel-Manjulaben adds, because he does not have any relatives in India. But he does not have any relatives in the United States either, making it all but impossible to second guess this aspect of the IJ's decision. Substantial evidence supports the IJ's finding that Patel-Manjulaben could reasonably avoid persecution by relocating to another part of India.

Because Patel-Manjulaben cannot establish that he is eligible for asylum, he necessarily cannot meet the more demanding requirements for withholding of removal. *See Yu v. Ashcroft*, 364 F.3d 700, 703 n.3 (6th Cir. 2004). Nor is there any evidence in the record that Patel-Manjulaben "more likely than not" would be tortured if returned to India. 8 C.F.R. § 208.16(c)(2).

III.

Patel-Manjulaben separately argues that his asylum-hearing transcript is constitutionally deficient and violates due process. Due process requires the government to give aliens access to a "reasonably accurate and complete transcript" of their removal proceedings. *Sterkaj v. Gonzales*, 439 F.3d 273, 279 (6th Cir. 2006). To establish a due-process violation on the basis of a deficient transcript, an alien must demonstrate "error and substantial prejudice." *Id*. at 279 n.2 (internal quotation marks omitted). That is to say, the alien must show that (1) the transcript is unreasonably "inaccurate or incomplete" and (2) he was substantially prejudiced by the error because "a complete and accurate transcript would have changed the outcome of the case." *Garza-Moreno v. Gonzales*, 489 F.3d 239, 242 (6th Cir. 2007) (internal quotation marks omitted).

Even if we assume for the sake of argument that several "indiscernible" notations in the transcript make it incomplete, ROA 116, Patel-Manjulaben has not established prejudice. Instead of pointing to specific omissions and explaining how they affected the outcome, Patel-Manjulaben offers only conclusions—that the omissions in general related to the "main basis for his claim" and prevented him from "adequately present[ing] his meritorious asylum case to the Board." Br. at 12. Conclusions by themselves, however, do not establish prejudice. *See Garza-Moreno*, 489 F.3d at 242.

Our own review of the transcript, at any rate, confirms the absence of prejudice. The transcript contains the vast majority of Patel-Manjulaben's testimony about the beating and the threat, as well as his description of the men who attacked him and his attempts to file a police report. While some details did not get recorded, many of them are clarified by context, and those that are not do not go to

the heart of Patel-Manjulaben's asylum claim.  A better record of the proceedings would have added little, if anything, to the testimony he gave—about the severity of the abuse, the ability and willingness of government officials to investigate the assault and punish the attackers, the motivation of his attackers or his ability to relocate to another portion of India.  The BIA correctly rejected this claim.

IV.

For these reasons, we deny the petition for review.