NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0601n.06
Filed: August 21, 2006

No. 05-3108

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| QEMAL METO; ADRIANA METO, | ) | ON APPEAL FROM THE |
| | ) | BOARD OF IMMIGRATION |
| *Petitioners,* | ) | APPEALS |
| | ) | |
| v. | ) | **O P I N I O N** |
| | ) | |
| ALBERTO R. GONZALES, Attorney General, | ) | |
| | ) | |
| *Respondent.* | ) | |

**BEFORE:** **BOGGS, Chief Judge; COLE, Circuit Judges; WISEMAN, District Judge.**[*]

**R. GUY COLE, JR., Circuit Judge.** Petitioners-Appellants Qemal Meto and Adriana

Meto, citizens of Albania, appeal the immigration judge's decision denying them asylum,

withholding of removal, and relief under the United Nations Convention Against Torture and Other

Cruel, Inhuman or Degrading Treatment or Punishment ("CAT") pursuant to 8 C.F.R. § 208.16(c).

The Metos argue that the immigration judge erred by failing to make an explicit credibility

determination, by requiring an unreasonable amount of corroboration, and by improperly analyzing

their claims of past and future persecution. The Metos further argue that the Board of Immigration

Appeals ("BIA") erred in evaluating their application under its streamlined procedures. For the

following reasons, we AFFIRM the decision of the immigration judge, as adopted by the BIA.

---

[*]The Honorable Thomas A. Wiseman, Jr., Senior United States District Judge for the Middle
District of Tennessee.

**I.**

Qemal and Adriana Meto, both citizens of Albania, entered the United States without proper documentation on October 29, 2000. The Immigration and Naturalization Service (INS) commenced removal proceedings against them. The Metos applied for asylum, withholding of removal, and relief under the CAT. A hearing was held before an immigration judge (IJ) in Detroit, Michigan, on October 1, 2003.

Qemal Meto testified that he was born in Cortia, Albania, on May 15, 1943, where he remained until he fled in 2000. Qemal's father was a merchant in Erseke, located in the district of Kolonja. Qemal testified that in 1946, his father's goods, land, and home were confiscated by the Albanian government, which accused his father of participating in "education propaganda" and undermining the new government. Qemal testified that his father was imprisoned for three years, and was released in 1949. He further testified that his uncles and some of his cousins were imprisoned during this time, and that one of his uncles was "eliminated."

Qemal worked in Cortia as a shoemaker from 1959 until 1994. From 1995 until he left Albania in 2000, Qemal was a shoemaker for "private associations." Qemal testified that he became involved in politics after the introduction of democracy in Albania. Qemal testified that, beginning in 1990, he participated in meetings and joined delegations in the villages to discuss democracy. He claimed to be motivated by his personal hatred for the Socialist regime because it had confiscated his family's property. Qemal testified that because of his political activity, he was arrested one afternoon and taken to the police station in July of 1991. Of the police, Qemal testified that:

> [W]hoever is Albanian knows that once they get you in their hands, in the police station, all they want to do is beat you up. . . . They mistreated, mistreated me and they also used psychological pressure on me, trying to tell me – telling me what are you trying to do getting involved in the democratic party, what are you getting out of this, and the fact of the matter was that I was a simple person and I did not get involved into higher standards.

Qemal also stated that he "got beat up by the police," that he was held for twelve hours, and that he was released the next morning.

The Democratic Party gained control in 1992. Qemal testified that after his arrest in 1991, his "hate became even stronger," and he became fully involved in and a member of the Democratic Party in 1993. In 1997, Qemal became a section leader, which required him to follow instructions from the leaders in Kolonja, such as arranging a counter-meeting whenever a Socialist meeting was being held. Qemal was also given the responsibility of handling political outreach issues in areas with a strong Socialist base. Finally, Qemal was made the election commissioner in Cortia, and was responsible for maintaining the peace at its election center. He testified that the armories were broken into, and that everyone had weapons, which they continued to possess as of the time Qemal left Albania in 2000. Qemal testified that during the July 1997 election, there were some minor disturbances at the election center in the form of arguments, which required police intervention. The Socialist Party won the 1997 election.

Qemal testified that a couple of days after the election, three people with masks came to Qemal's street, where they attacked him. Qemal testified that as they hit him, the attackers said "this is the one from the democratic party, and he is courageous, we [sic] going to show him now." Qemal testified that he lost consciousness on the street, and that he received unspecified fractures,

as well as a black eye and a broken tooth, for which he was treated at home. Qemal did not change his level of involvement in the Democratic Party after the attack, even though he was insulted "[e]very time [he and his wife] went out." Qemal testified that people harassed his daughter Gerta because of her involvement with the Democratic Party. After Gerta declined invitations to join the Socialist Party, Qemal escorted her to school out of fear that she would be kidnapped and forced into prostitution in Greece or Italy, which he testified often happened to women in Cortia. Qemal testified that there was a thwarted attempt to kidnap Gerta, but did not testify as to the details of that attempt. Gerta legally entered the United States in August of 1999 to attend college.

Qemal testified that the political parties grew active in anticipation of an election to be held in October of 2000. Qemal testified that he was approached to help the Socialist Party win the election. The record is silent as to who approached him. Qemal refused. He testified that because of his refusal, two policemen took him to the police station, where they kicked and beat him with sticks, and detained him for twenty-four hours in a "humid and wet cell." He testified that the police told him that if he "d[id] any other things," he would be killed. Qemal testified that the Democratic Party lost that election because the votes were manipulated, although he does not specify by whom.

Qemal testified that an explosive was thrown at his home around midnight on October 8, 2000, the same day that he was detained by the police, and that the explosive cracked both the walls and windows. Qemal testified that the stone fence surrounding his home had to be demolished because of damage from the explosion. Qemal offered into evidence a picture of the damage taken by his nephew. After the explosion, Qemal and Adriana went to the city of Tirana to live with a

cousin, but returned to their home occasionally in the middle of the night. Qemal and Adriana left Albania on October 28, 2000, after paying an unknown person to prepare papers and passports.

Qemal testified that if he returned to Albania, his life would be in danger. He testified that he knew that the explosive device and attempted kidnapping of his daughter were related to his political beliefs because there was no other basis for such attacks. Qemal also testified that the Albanian government generally does not take efforts to prevent or punish criminal activity.

Gerta Meto testified that while living in Cortia, she was involved in a musical group that performed on the radio. She testified that employees of the radio station asked Qemal to refrain from his involvement with the Democratic Party, or else Gerta would not be able to continue to perform. She also testified that her family received various letters, which threatened the murder or kidnapping of Gerta if Qemal did not resign from the Democratic Party. She testified that because of the threats, she was unable to travel to school by herself or leave the house at night. When asked by the Metos' attorney if there were any attempts to kidnap her or any "close calls," Gerta testified in the negative. She testified that her father had been arrested and held overnight twice, once in 1991 and again in 1997. Adriana did not testify at the hearing.

The record also contains a written certification that Qemal is a member of the Cortia branch of the "Ex-Political Persecuted Persons Association," and a "family certificate" issued by Albania, which attests that Qemal, Adriana, and Gerta are members of the same family. Additionally, the record contains a certificate verifying Qemal's membership in the Democratic Party, signed by Alfred Olli, the party's chairman.

The IJ found that Qemal was arrested in 1991 and did suffer some harm, but that the harm was "minuscule," because Qemal failed to describe it in his application and equivocated about whether he had been beaten on that occasion. The IJ found that Qemal had been beaten in 1997, but also concluded that Qemal had not demonstrated that he had been arrested, partly because he failed to record that arrest in his asylum application. The IJ determined that even if the 1997 beating had been administered for political reasons, it did not rise to the level of past persecution. The IJ found that there was no attempt to kidnap Gerta, and that because Qemal lied about it other aspects of his testimony were rendered less credible.

The IJ declined to find that Qemal had been arrested in 2000, because no other testimony corroborated Qemal's account, and because the IJ determined that Qemal had lied about the attempted kidnapping. The IJ similarly declined to find that a bomb had detonated outside the Metos' house, because although there was evidence that the home had been damaged, neither Adriana nor Gerta testified to the existence of a bomb or explosion.

Finally, the IJ concluded that Qemal's testimony had not been sufficiently corroborated. The IJ found that the Metos had not demonstrated that they suffered past persecution, and thus were not entitled to a rebuttable presumption of future persecution; and that even if the IJ credited Qemal's testimony, Qemal did not testify to events amounting to past persecution. Furthermore, the IJ found that the State Department Country Report for Albania indicated that the anarchy that once existed in Albania had abated, and that members of the Democratic Party were no longer subject to violence and persecution. The IJ did not specifically address the Metos' claim for relief under the CAT.

The IJ denied the Metos' application for asylum, withholding of removal, and relief under

the CAT. The BIA adopted the IJ's decision in a per curiam order signed by a single BIA member.

This appeal follows.

**II.**

**A.      Standard of Review and Burden of Proof**

The Attorney General has discretion under the Act to grant asylum to a "refugee."

Immigration and Naturalization Act (INA) § 208(b), 8 U.S.C. § 1158(b). A refugee is a person who

is unable or unwilling to return to his home country "because of persecution or a well-founded fear

of persecution on account of race, religion, nationality, membership in a particular social group, or

political opinion." 8 U.S.C. § 1101(a)(42)(A). "Disposition of an application for asylum requires

a two-step inquiry: first, whether the petitioner is a 'refugee' within the meaning of the statute, and

second, whether the petitioner merits a favorable exercise of discretion by the Attorney General."

*Perkovic v. I.N.S.*, 33 F.3d 615, 620 (6th Cir. 1994) (citing *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421,

428 n.5 (1987)). The petitioner bears the burden of proof at both stages. *Pilica v. Ashcroft*, 388 F.3d

941, 950 (6th Cir. 2004) (citing *Klawitter v. I.N.S.*, 970 F.2d 149, 151 (6th Cir. 1992)).

In order to qualify as a refugee, the Metos must establish either that they have suffered actual

past persecution or that they have a well-founded fear of future persecution. *Pilica*, 388 F.3d at 950

(citation omitted); 8 C.F.R. § 208.13(b). Under 8 U.S.C. § 1101(a)(42)(A), past persecution

"requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied

by any physical punishment, infliction of harm, or significant deprivation of liberty." *Mikhailevitch*

*v. I.N.S.*, 146 F.3d 384, 390 (6th Cir. 1998).  If the Metos establish past persecution, they are presumed to have a well-founded fear of future persecution**.**  *Id.* at 389; 8 C.F.R. § 208.13(b)(1).

Even if they cannot demonstrate past persecution, the Metos may be eligible for asylum if they independently demonstrate that they have a well-founded fear of future persecution.  "An alien may establish a well-founded fear of future persecution by demonstrating: (1) that he has a fear of persecution in his home country on account of race, religion, nationality, membership in a particular social group, or political opinion; (2) that there is a reasonable possibility of suffering such persecution if he were to return to that country; and (3) that he is unable or unwilling to return to that country because of such fear."  *Pilica*, 388 F.3d at 950 (citing *Mikhailevitch*, 146 F.3d at 389, and 8 C.F.R. § 208.13(b)(2)(i))**.**

In addition to requesting asylum, the Metos appeal the IJ's decision denying them withholding of removal pursuant to INA § 241(b)(3).  An applicant seeking withholding of removal faces a more stringent burden than what is required on a claim for asylum.  *Mikhailevitch*, 146 F.3d at 391 (citing *Cardoza-Fonseca*, 480 U.S. at 431-32).  In order to be entitled to relief, an alien must establish that there is a clear probability that he will be subject to persecution if forced to return to the country of removal.  *I.N.S. v. Stevic*, 467 U.S. 407, 413 (1984).

Although the Metos applied for relief under the CAT, they do not appeal the IJ's decision denying them relief on that ground.

When the BIA summarily upholds the IJ's decision, as occurred here, we review the IJ's decision directly.  *Denko v. I.N.S.*, 351 F.3d 717, 723 (6th Cir. 2003).  We  must uphold the IJ's factual findings if those findings are supported by "reasonable, substantial, and probative evidence

on the record considered as a whole." *I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (quoting

8 U.S.C. § 1105a(a)(4)). We have clarified that an IJ's factual findings are "conclusive unless any

reasonable adjudicator would be compelled to conclude to the contrary." *Yu v. Ashcroft*, 364 F.3d

700, 702 (6th Cir. 2004) (quoting 8 U.S.C. § 1252(b)(4)(B)). We review the IJ's legal conclusions

*de novo*. *Tapucu v. Gonzales*, 399 F.3d 736, 738 (6th Cir. 2005).

## B.      Factual Findings

The Metos argue that the IJ's decision was not supported by substantial evidence, and that

the record compels factual findings contrary to those made by the IJ. The IJ made several findings

of fact, which are "conclusive unless any reasonable adjudicator would be compelled to conclude

to the contrary." *Yu*, 364 F.3d at 702. The IJ found that although Qemal was arrested in 1991, any

physical harm he suffered was minuscule, as evidenced by the fact that he declined to mention the

harm in his asylum application, and because his testimony as to his treatment by the police was

internally inconsistent. Next, the IJ found that although Qemal had been beaten by someone in

1997, he declined to find that Qemal had been arrested or to make a finding as to the abuser's

identity, because Qemal's initial account during his testimony of the event describes a beating but

makes no mention of police officers or detention. The IJ found that there had been no attempt to

kidnap Gerta, based on her clear testimony that there was never any such attempt. The IJ declined

to find that Qemal had been arrested in 2000, because Qemal failed to offer any corroborating

evidence. Finally, the IJ concluded that the Metos had not met their burden of proving that a bomb

had been planted outside their home for political reasons. The IJ noted that although the pictures

of the home indicated that there were some cracks in the house, there was no corroboration that the

pictured house was in fact the home in which the Metos lived, and there was no corroboration that the cracks were caused by an explosion.

The record does not compel findings of fact contrary to those found by the IJ. The IJ declined to make those findings urged by the Metos only when presented with conflicting testimony, or when there was a complete lack of corroboration. The IJ found that, based on his determination that Qemal had lied about an attempt to kidnap Gerta, Qemal's testimony was not fully credible. We review an IJ's credibility determination for clear error. *Tran v. Gonzales*, 447 F.3d 937, 943 (6th Cir. 2006) (citing 8 C.F.R. § 1003.1(d)(3)(I)). Given Gerta's conflicting testimony, the IJ's credibility determination was not clearly erroneous. Furthermore, the IJ did not err in discounting other portions of Qemal's testimony because Qemal's unsupported testimony about the kidnapping attempt went to the heart of the Metos' claim that they were persecuted. *See Sylla v. I.N.S.*, 388 F.3d 924, 926 (6th Cir. 2004) ("An adverse credibility finding must be based on issues that go to the heart of the applicant's claim.").

Given the IJ's finding that Qemal's testimony was not fully credible, the IJ did not err in requiring that the Metos present corroborating evidence. "Where the alien's testimony could be viewed as incredible, inconsistent, or incoherent, a fact-finder may reasonably conclude, absent corroboration, that the testimony is insufficient to meet the standard of proof required." *Sacko v. Gonzales*, 434 F.3d 857, 862 (6th Cir. 2006) (citing *Pilica*, 388 F.3d at 954). Furthermore, given that Adriana sought asylum under the same application as Qemal, it was not unreasonable for the IJ to expect Qemal's account to be corroborated by Adriana's testimony. "[W]here it is reasonable to expect corroborating evidence . . . [t]he absence of such corroborating evidence can lead to a

finding that an applicant has failed to meet her burden of proof." *Dorosh v. Ashcroft*, 398 F.3d 379, 382 (6th Cir. 2004).

Based on the conflicting testimony regarding an attempt to kidnap Gerta and the lack of corroborating evidence, the IJ's factual findings are supported by reasonable, substantial and probative evidence.

## C.    Persecution

Finally, the Metos argue that the IJ erred by failing to analyze past and future persecution as distinct elements. In this case, the IJ found that the Metos had not demonstrated that they had suffered any past persecution, even crediting all of Qemal's testimony, and that the Metos were not entitled to a presumption of a reasonable fear of future persecution. The IJ then found that, based on the Country Report noting the decline of anarchy in Albania, the Metos had similarly failed to demonstrate a well-founded fear of future persecution.

As to past persecution, the IJ concluded that the Metos had not proven that Qemal was arrested in 1997 or 2000, that there was an attempted kidnapping of Gerta, or that a bomb exploded in 2000. These findings of fact are sufficiently supported by the record; hence, we are not compelled to dismiss them. Although we have held that interrogation can cross the line from harassment to persecution, *Gilaj v. Gonzales*, 408 F.3d 275, 285 (6th Cir. 2005), Qemal's testimony — stating that the police asked him "what are you trying to do getting involved in the democratic party, what are you getting out of this" — does not compel us to conclude that the conduct in this case crossed that line. Given Qemal's testimony, and the fact that the alleged incident took place more than fifteen years ago, we will not disturb IJ's conclusion that this incident does not constitute past persecution

sufficient to create a presumption of a well-founded fear of future persecution. *See Rreshpja v. Gonzales*, 420 F.3d 551, 556 (6th Cir. 2005) (holding that an isolated instance of persecution was insufficient to establish persecution).

As to a well-founded fear of future persecution, the IJ relied on the 2001 Country Report, which notes that "in today's atmosphere it is highly unlikely that many applicants will have credible claims to political persecution." The report further indicates that "the government has neither the means nor the will to carry out systemic persecution." Based on the IJ's findings of fact, which are supported by substantial evidence, the IJ's conclusion that the Metos did not have a well-founded fear of future persecution was not in error. The Metos have not demonstrated that "there is a 'reasonable possibility' that [they] would be targeted for persecution upon [their] return." *Pilica*, 388 F.3d at 955 (citing *Mikhailevitch*, 146 F.3d at 389).[1]

## III.

For the foregoing reasons, we **AFFIRM** the decision of the IJ, as adopted by the BIA.

---

[1]The Metos additionally argue that the BIA erred in adopting the decision of the IJ by way of a single member order, which the BIA may do if the issues on appeal are "squarely controlled by existing Board or federal court precedent and do not involve the application of precedent to a novel factual situation," or, if the "factual and legal issues raised on appeal are not so substantial that the case warrants the issuance of a written opinion." 8 C.F.R. § 1003(1)(e)(4)(I). Whether the BIA's decision to streamline a particular case may be reviewed by this Court remains an open question in this circuit, *Rreshpja*, 420 F.3d at 558. Because none of the issues raised on appeal are novel or so substantial as to require an opinion by the BIA, we need not decide whether the BIA's decision to implement its streamlined procedures in a given case is reviewable.